648

ENTE NAZIONALE PER L'ENERGIA ELECTTRICA, Plaintiff,

v.

BALIWAG NAVIGATION, INC. and Wheelock Marine Services, Ltd., Defendants,

and

REX SHIPPING COMPANY S.A. OF PANAMA in personam and M/V KUN-IANG, her engines, tackle, and apparel, etc., in rem, Appellees,

v.

CRAVAT COAL COMPANY, Third Party Defendant and Third Party Plaintiff,

v.

BALIWAG NAVIGATION, INC., Wheelock Marine Services, Ltd., Almare Societa di Navigazione S.P.A., Cooper Stevedoring Company, Inc., Third Party Defendants,

and

Alla-Ohio Valley Coals, Inc., Appellant.

ENTE NAZIONALE PER L'ENERGIA ELECTTRICA, Plaintiff,

v.

BALIWAG NAVIGATION, INC. and Wheelock Marine Services, Ltd., Defendants,

and

REX SHIPPING COMPANY S.A. OF PANAMA in personam and M/V KUN-IANG, her engines, tackle, and apparel, etc., in rem, Appellees,

v.

CRAVAT COAL COMPANY, Appellant,

v.

BALIWAG NAVIGATION, INC., Wheelock Marine Services, Ltd., Almare Societa di Navigazione S.P.A., Cooper Stevedoring Company, Inc., and Alla-Ohio Valley Coals, Inc., Third Party Defendants.

ENTE NAZIONALE PER L'ENERGIA ELECTTRICA, Plaintiff,

v.

BALIWAG NAVIGATION, INC. and Wheelock Marine Services, Ltd., Defendants,

and

REX SHIPPING COMPANY S.A. OF PANAMA in personam and M/V KUN-IANG, her engines, tackle, and apparel, etc., in rem, Defendants and Third Party Plaintiffs,

v.

CRAVAT COAL COMPANY, Appellee,

v.

BALIWAG NAVIGATION, INC., Wheelock Marine Services, Ltd., Almare Societa di Navigazione, S.P.A., Third Party Defendants,

Cooper Stevedoring Company, Inc., Appellant,

and

Alla-Ohio Valley Coals, Inc., Appellee.

ENTE NAZIONALE PER L'ENERGIA ELECTTRICA, Plaintiff,

v.

BALIWAG NAVIGATION, INC. and Wheelock Marine Services, Ltd., Defendants,

and

REX SHIPPING COMPANY S.A. OF PANAMA, in personam, and M/V KUN-IANG, her engines, tackle, and apparel, etc., in rem, Defendants and Third Party Plaintiffs,

v.

CRAVAT COAL COMPANY, Appellant,

v.

BALIWAG NAVIGATION, INC., Wheelock Marine Services, Ltd., Almare Societa di Navigazione S.P.A., Cooper Stevedoring Company, Inc., Third Party Defendants,

and

Alla-Ohio Valley Coals, Inc., Appellee.

ENTE NAZIONALE PER L'ENERGIA ELECTTRICA, Plaintiff,

v.

BALIWAG NAVIGATION, INC. and
Wheelock Marine Services, Ltd.,
Defendants,

and

REX SHIPPING COMPANY S.A. OF
PANAMA, in personam, and M/V KUN-
IANG, her engines, tackle, and apparel,
etc., in rem, Defendants and Third Par-
ty Plaintiffs,

v.

CRAVAT COAL COMPANY, Appellee,

v.

BALIWAG NAVIGATION, INC., Wheel-
ock Marine Services, Ltd., Almare So-
cieta di Navigazione S.P.A., Cooper Ste-
vedoring Company, Inc., Third Party
Defendants,

and

Alla-Ohio Valley Coals, Inc., Appellant.

Nos. 84–1996(L), 84–1997 to 84–1999
and 84–2001.

United States Court of Appeals,
Fourth Circuit.

Argued May 6, 1985.

Decided Oct. 10, 1985.

Rehearing and Rehearing En Banc
Denied Nov. 5, 1985.

Gregory N. Stillman, Hunton & Williams, Norfolk, Va., for Cravat Coal Co.

Daniel R. Warman, John Y. Richardson, Jr., Williams, Worrell, Kelly & Greer, P.C., Norfolk, Va., for Alla-Ohio Valley Coals, Inc.

R. Arthur Jett, Jr., Jett, Agelasto, Berkley, Furr & Price, Norfolk, Va., for Cooper Stevedoring Co., Inc.

Carter T. Gunn, Hugh Meredith, Vandeventer, Black, Meredith & Martin, Norfolk, Va., for Rex Shipping Co.

Before HALL and CHAPMAN, Circuit Judges and KNAPP, United States District Judge for the Southern District of West Virginia, sitting by designation.

CHAPMAN, Circuit Judge:

The original plaintiff, Ente Nazionale Per L'Energia Electtrica (ENEL), an Italian power company, brought an action in admiralty against the original defendant and third-party plaintiff, Rex Shipping Company S.A. of Panama (Rex), for Rex's failure to deliver a cargo of steam coal to ENEL. The coal shipment never arrived in Italy because the ship carrying the steam coal, the *M/V Kuniang*, ran aground through vessel negligence and because the transfer of the coal from the *M/V Kuniang* to another vessel was stopped when the coal began to heat. ENEL and Rex reached a settlement agreement prior to trial.

Rex then brought this action in admiralty for contribution or indemnification against third-party defendants Cravat Coal Company (Cravat), Alla-Ohio Valley Coals, Inc. (AOV), and Cooper Stevedoring Company, Inc. (Cooper). Rex alleged that the combined negligence of the third-party defendants caused the coal to heat which in turn caused the termination of the transshipment operation and increased the cost of handling the coal. Rex sought contribution or indemnification from the third-party defendants for the increased costs of handling the coal required by the coal's heat. Cravat and AOV appeal from the decision of the district court finding them jointly and severally liable for one-third of the increased costs Rex incurred in handling the coal. Cooper settled with Rex on the first day of trial.

We hold that the alleged negligence of Cravat and AOV in failing to warn the *M/V Kuniang's* Master of the potential problems with the coal loaded aboard the ship was not a cause in fact of the damages Rex suffered because of the heating of the coal. Accordingly, we reverse that portion of the district court's decision, 605 F.Supp. 355 (D.C.Va.1984), finding Cravat and AOV jointly and severally liable for one-third of the increased costs Rex incurred in handling the coal.

I

A. *The Parties*

The original plaintiff, ENEL, is an Italian corporation involved in the production, transmission, and distribution of electricity. ENEL was the consignee of the cargo of approximately 45,254.03 long tons of steam coal loaded aboard the *M/V Kuniang*. The original defendant and third-party plaintiff, Rex, is a Panamanian corporation which was the registered owner of the *M/V Kuniang*. The *M/V Kuniang* is an ocean-going carrier of approximately 29,000 gross tons and is registered under the flag of the Republic of Panama.

Third-party defendant Cravat is an Ohio corporation which contracted to sell approximately 200,000 metric tons of steam coal to ENEL in four approximately equal shipments. The coal aboard the *M/V Kuniang* represented the second of the four scheduled shipments. Cravat is a producer and seller of coal in the domestic and export markets.

Third-party defendant AOV is a Florida corporation presently operating as a debtor in possession under bankruptcy proceedings in the United States District Court for the District of Columbia pursuant to Chapter 11 of the Bankruptcy Code. AOV actually supplied the coal loaded on the *M/V Kuniang* pursuant to an agreement with Cravat.

Third-party defendant Cooper is an Alabama corporation which loaded the coal aboard the *M/V Kuniang* at Darrow, Louisiana, between March 25 and April 2, 1981.

### B. *The District Court's Findings of Fact*

In rendering its decision the district court made the following findings of fact. On June 17, 1980, Cravat contracted to sell approximately 200,000 metric tons of Pond Creek "type" steam coal to ENEL in four approximately equal shipments. Although the contract between Cravat and ENEL originally called for Cravat to ship the coal through the Port of Hampton Roads, Virginia, the parties later agreed by amendment to the contract to ship the coal through the Port of New Orleans, Louisiana. The parties designated Commercial Testing and Engineering Company (CTE), a commercial testing laboratory, to test the coal to determine whether it met the contract specifications.

In November 1980 Cravat determined that it would be unable to supply the coal called for in its contract with ENEL. Consequently, on November 28, 1980, Cravat and AOV entered into an agreement in which AOV agreed to supply the coal called for in the Cravat-ENEL contract. AOV and Cravat agreed that Cravat would be listed as the shipper on the bill of lading and other shipping documents. Neither ENEL nor Rex was aware of AOV's involvement.

AOV contracted with various coal suppliers to purchase barge loads of coal. AOV obtained the coal for the shipment in question from nine suppliers. The coal was carried aboard barges to the loading site. The *M/V Kuniang*, which was voyage-chartered to ENEL, arrived at its loading berth at Darrow, Louisiana, on March 25, 1981. Prior to loading SGS Control Services, Inc. (SGS), a commercial testing laboratory, and Deep Sea Marine Surveyors, Inc. inspected the vessel's cargo holds for cleanliness and readiness to load coal. Furthermore, CTE and SGS sampled and analyzed the coal prior to loading. The testing companies reported that the coal met the contract specifications. Neither reported any problems with the coal.

Cooper's berth at Darrow is a mid-stream loading berth. Coal is transferred from the barges to the vessel by floating cranes which lift the coal into the ship using clamshell buckets. Cooper began loading the *M/V Kuniang* on the morning of March 25 and finished on April 2, 1981. Cooper did not trim or compact the coal. Instead, Cooper stowed the coal in the holds in a peaked fashion. Trimming a cargo of coal involves leveling and compacting the cargo throughout the hold with a tractor or bulldozer. Cooper concedes that trimming and compacting the coal is a normal practice in the coal shipping industry.

During the loading of the vessel the Master of the *M/V Kuniang*, Captain Jose A. Calbes, observed what appeared to be steam coming from the coal aboard two of the barges. At his request AOV arranged for SGS and CTE to examine the coal aboard the two barges. The testing lab employees examined both loads of coal and SGS reported that the coal was "in good exportable condition." The Master thereafter accepted the coal aboard the two barges for loading aboard the *M/V Kuniang*.

The bill of lading contained no comments concerning the quality of the coal or its suitability for shipment. The bill of lading was completely "clean." In addition, upon the completion of the loading of the *M/V Kuniang*, SGS issued a certificate of loading dated April 2, 1981, stating that the vessel was loaded "in accordance with all known practices of good seamanship, with observance of all known rules and regulations for loading in bulk." The certificate

was signed by the Master of the *M/V Kuniang.*

On the morning of April 2, 1981, the *M/V Kuniang* departed Darrow for La Linea, Gilbraltar, with its cargo of steam coal. The *M/V Kuniang's* final destination was either Vado Lingure or La Spezia, Italy. The vessel expected to arrive in Italy in approximately fifteen to eighteen days.

The *M/V Kuniang* developed an engine problem shortly after it got underway. Sea water had contaminated the vessel's main engine lube oil. Lube oil purifiers were unable to remove the sea water from the lube oil, and it became necessary to shut down the main engine. The *M/V Kuniang* was then located west of Florida in the Gulf of Mexico. On April 4 the Chief Mate began taking temperatures of the cargo and the Captain, thinking that the temperature of some cargo holds was a little high, ordered the ventilation of the cargo holds. Ventilation of the body of the coal was contrary to the owner's instructions.

On the morning of April 4 the crew drained the contaminated lube oil and replaced it with spare lube oil. The *M/V Kuniang* then resumed her voyage, but two hours later the Chief Engineer informed the Captain that the ship did not have sufficient spare lube oil on board to complete the transatlantic crossing. As a result the Captain, at the direction of Rex's managing agent, diverted the vessel to Miami, Florida, where additional lube oil could be obtained to replenish the *M/V Kuniang's* supply.

The *M/V Kuniang* arrived in Miami on the afternoon of April 5, 1981. The vessel did not have on board adequate pilot charts for the Miami area. The vessel anchored once, dragged anchor, and re-anchored. On April 6 the *M/V Kuniang* dragged anchor again and grounded. The grounding severely damaged the bottom of the vessel. Hold 8 was completely flooded by sea water and hold 6 and 7 were partially flooded.

The *M/V Kuniang* remained anchored off Miami because of the damage from April 5 to April 13, 1981. The Master ventilated the vessel's cargo holds during this time. Winds of force 3–5 were recorded in the log and, as testified to by the expert for Rex, this passage of air over the peaked piles of coal would create a "chimney effect" drawing air through the coal and exacerbating any potential for heating.

It was determined that the *M/V Kuniang* could not continue her voyage and would have to be dry-docked for repairs. Accordingly, the vessel left Miami in tow on April 13, 1981, headed for Norfolk, Virginia. The Master allowed the vessel's hatch covers to remain open during at least part of the tow and the coal further ventilated. The *M/V Kuniang* arrived at Sewell's Point Anchorage, Norfolk, Virginia, on April 21, nineteen days after departing Darrow, Louisiana.

The coal aboard the *M/V Kuniang* had to be off-loaded before the ship could enter dry-dock for repairs. It was decided that the coal aboard the *M/V Kuniang* would be off-loaded to another ship, the *M/V Garden Neptune,* which would then carry the coal to its destination in Italy. To accomplish this transshipment the *M/V Garden Neptune* was moored parallel to the *M/V Kuniang* with a bucket crane between the two vessels. The transfer of the coal from the *M/V Kuniang* to the *M/V Garden Neptune* began on May 7, 1981. From arrival in Norfolk on April 21 to the beginning of the transshipment operation on May 7, the Master of the *M/V Kuniang* left the hatch covers open every day, further ventilating the coal.

During the transshipment operation the bucket crane and barges continually collided with the *M/V Kuniang* and the *M/V Garden Neptune.* As a result the two vessels suffered approximately $400,000 in physical damage unrelated to the problems associated with the coal. On May 13 the Master of the *M/V Garden Neptune* refused to accept any more coal from the *M/V Kuniang* because the coal had begun to heat and the transshipment operation was thereafter terminated. The district court found that the transshipment opera-

tion was terminated due to a combination of factors, including the heating of the coal and the damage sustained by the vessels. On May 14 the discharge of the *M/V Kuniang* continued onto barges.

On May 16, 1981, a tug towed the *M/V Kuniang* to the Elizabeth River Terminals (ERT) in Chesapeake, Virginia, where the remainder of the vessel's cargo of coal was discharged to ground storage. On May 27 the *M/V Kuniang* completed discharging all of its coal, with the exception of approximately 100 tons of sea water-wetted coal remaining in hold 8. Between May 18 and May 24 barges which had received coal from the *M/V Kuniang* at Sewell's Point were discharged to ground storage at ERT. Between May 30 and June 5 the *M/V Garden Neptune* discharged at ERT the coal she had received from the *M/V Kuniang.* On June 5, 1981, after all the coal had been discharged to ground storage at ERT, Rex declared the voyage abandoned.

The coal was reblended while in ground storage at ERT. AOV repurchased the coal in ground storage from ENEL and later resold it at a substantial profit. Beginning September 12, 1981, the coal was transported by barge from ERT to Lambert's Point Dock in Norfolk, Virginia, where it was loaded aboard the *M/V Nordvard.* The *M/V Nordvard* subsequently carried the cargo of steam coal safely to Finland.

### C. *The District Court's Holding*

ENEL brought this action against Rex *in personam* and the *M/V Kuniang in rem* under the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1303. ENEL and Rex reached a settlement agreement prior to trial. On the first day of trial Rex and Cooper, the stevedore which loaded the coal on the *M/V Kuniang* at Darrow, Louisiana, settled their claims. Accordingly, the only matter before the district court was Rex's claims against third-party defendants Cravat and AOV, the suppliers of the coal loaded on the *M/V Kuniang.* Rex sought indemnity or contribution from them for the increased costs it incurred in handling the *M/V Kuniang's* coal once the coal heated and caught fire, including the amount paid ENEL in settlement, together with the costs of discharging *M/V Kuniang's* coal to ground storage, the costs of caring for the coal once unloaded, and damages to be paid in General Average.

The district court bifurcated the trial and has determined only the issue of liability. After trial and briefing by the parties the district court found that "if the coal had not heated, the transshipment operation would have been successful and the coal would have reached Italy safely." The district court also found that "the heating of the coal was caused by the combined acts of Cooper, Rex, AOV and Cravat." More specifically, the district court held that (1) Cooper contributed to the heating of the coal by failing to trim and compact the coal; (2) Rex contributed to the heating of the coal by ventilating the coal cargo and by delaying the voyage; and (3) AOV and Cravat contributed to the heating of the coal by failing to warn the *M/V Kuniang's* Master that the steam coal loaded aboard the ship contained a relatively large percentage of fines and that he needed to avoid ventilating the coal.

Based upon these findings of fact the district court held that Cooper and Rex were each liable for one-third of the increased costs of handling the coal. The district court also held that Cravat and AOV were jointly and severally liable for one-third of these costs.

The district court awarded Rex damages for the alleged negligence of AOV and Cravat under general maritime law. Rex's recovery from AOV and Cravat was limited to one-third of those damages "directly attributed to the costs of handling the coal after it became too hot to be transshiped aboard the *M/V Garden Neptune,*" including Rex's settlement with ENEL to the extent that it included these damages. Rex cannot recover from Cooper because of their settlement agreement. AOV and Cravat then brought this appeal.

### II

The findings of fact of a district court sitting without a jury in an admiralty

case are reviewed under the "clearly erroneous" standard of Fed.R.Civ.P. 52(a). *Guzman v. Pichirilo*, 369 U.S. 698, 702, 82 S.Ct. 1095, 1097, 8 L.Ed.2d 205 (1962); *McAllister v. United States*, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954). "A finding is clearly erroneous when 'although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.'" *Id.* at 20, 75 S.Ct. at 8 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). The Supreme Court has recently reaffirmed this standard of review under Rule 52(a) in *Anderson v. City of Bessemer City*, —— U.S. ——, ——, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). In determining whether the district court's findings are clearly erroneous, this court must construe the evidence in the light most favorable to the appellee. *Walker Transportation Co. v. Neylon*, 396 F.2d 558, 565 (8th Cir.1968); *North American Van Lines, Inc. v. Brown*, 248 F.2d 905, 914 (8th Cir.1957).

■ Several circuits have held that questions of negligence in admiralty are treated as factual issues and are thus subject to the clearly erroneous standard. *Noritake Co., Inc. v. M/V Hellenic Champion*, 627 F.2d 724, 728 (5th Cir.1980); *United Barge Co. v. Notre Dame Fleeting & Towing Service, Inc.*, 568 F.2d 599, 602 (8th Cir. 1978); *Hasbro Industries, Inc. v. M/S St. Constantine*, 705 F.2d 339, 341 (9th Cir. 1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 537, 78 L.Ed.2d 717 (1983). Thus, we are compelled to review the district court's findings of fact, including its finding as to causation, under the clearly erroneous standard of Fed.R.Civ.P. 52(a).

### III

The basis for the district court's conclusion that Cravat and AOV were jointly and severally liable for one-third of the increased costs Rex incurred in handling the heated coal was the testimony of Rex's expert witness, Dr. William F. Berry. Since 1960 Dr. Berry has served as the president of an independent consulting firm oriented primarily toward the coal industry, not only in the United States, but around the world. He has advised major U.S. coal companies, steel companies, and cement producers. Over the past twenty-five years Dr. Berry has been extensively involved with the storage and stockpiling of coal, as well as projects involving the blending of coal, including steam coal, the type of cargo loaded aboard the *M/V Kuniang*. Dr. Berry has authored numerous papers on the subject of the spontaneous combustion of steam coal. He has also served as consultant to the European Common Market and his firm has been appointed as the bulk fire cargo experts for the Republic of Panama. In May 1981 Rex retained Dr. Berry to keep the coal from burning while in ground storage. For this purpose he made numerous trips to the Elizabeth River Terminals to direct and monitor the blending of the coal piles.

At trial Dr. Berry testified that the steam coal loaded aboard the *M/V Kuniang* had an unusually high propensity to combust spontaneously because of the presence of an excess percentage of fines in the coal. Dr. Berry defined fines as small particles of steam coal which will pass a 20 mesh screen. Dr. Berry testified that fines have a great propensity to self-heat because of their surface area. The greater the surface area of a given particle of coal, the more exposure there is to air and hence its ability to react with oxygen. Dr. Berry testified that as the size of the coal decreases, the amount of available surface area increases thereby dramatically increasing its potential to self-heat.

The analyses of Norfolk Testing Laboratories and the tests conducted by Dr. Berry reveal that the *M/V Kuniang's* cargo of steam coal contained an excessive amount of fines. Rex maintains that the *M/V Kuniang's* cargo contained approximately 50% fines with some holds having as much as 79% fines. Dr. Berry testified that these fines were layered among the other types of coal. The evidence at trial established that an ordinary shipment of steam

coal will usually contain approximately 10% to 20% fines.

At trial Dr. Berry testified that the best and safest method of handling steam coal which contained a high percentage of fines was intimate blending prior to loading. He further testified that because the steam coal carried aboard the *M/V Kuniang* was not intimately blended prior to its loading, the cargo had a propensity to heat five times greater than that of an average shipment of steam coal. Dr. Berry stated that if the *M/V Kuniang's* coal cargo had been blended properly it could have been transferred successfully to the *M/V Garden Neptune* and delivered to its destination in Italy, despite the high percentage of fines it contained. In fact, this same coal was exported safely to Finland without incident after intimate blending.

Under general maritime law a shipper has a duty to warn the stevedore and the ship owner of the foreseeable hazards inherent in the cargo of which the stevedore and the ship's master could not reasonably have been expected to be aware. *Ionmar Compania Naviera, S.A. v. Olin Corp.,* 666 F.2d 897, 904 (5th Cir. 1982); *Harrison v. Flota Mercante Grancolombiana, S.A.,* 577 F.2d 968, 977 (5th Cir.1978). Conversely, the shipper has no duty to warn the stevedore and the ship owner of hazards of which they were aware or could reasonably have been expected to have been aware. *Martinez v. Dixie Carriers, Inc.,* 529 F.2d 457, 464 (5th Cir.1976). In this case Rex argued, and the district court so held, that Cravat and AOV had a duty to ascertain the true nature and characteristics of their cargo and to warn the *M/V Kuniang's* Master that the cargo of steam coal contained a relatively large percentage of fines and to avoid ventilation of the coal. The district court found that Cravat and AOV were jointly and severally liable for one-third of the increased costs Rex incurred in handling the heated coal because they failed to discharge their duty to warn. In this case we may assume without deciding that Cravat and AOV had such a duty to warn.

Cravat and AOV raised numerous issues on appeal, including whether the district court erred in finding that the *M/V Kuniang's* cargo contained an excessive amount of fines and, if so, whether they were under a duty to warn the *M/V Kuniang's* Master about the fines. However, the only issue we need consider, given our resolution of this issue, is whether the alleged negligence of Cravat and AOV in failing to warn the *M/V Kuniang's* Master that the cargo contained a relatively large percentage of fines and to avoid ventilation of the coal was a "contributing cause" of the damages Rex incurred in off-loading and storing the coal in Norfolk.

"Generally, 'proximate cause' in the admiralty context is defined as 'that cause which in a direct, unbroken sequence produces the injury complained of and without which such injury would not have happened.'" *Olympic Towing Corp. v. Nebel Towing Co., Inc.,* 419 F.2d 230, 233 (5th Cir.1969), *cert. denied,* 397 U.S. 989, 90 S.Ct. 1120, 25 L.Ed.2d 396 (1970) (quoting *Olsen v. States Line,* 378 F.2d 217, 221 n. 7 (9th Cir.1967)). In *Olympic Towing* the Fifth Circuit stated that the above definition "obviously describes a cause-in-fact principle, while proximate cause in the common law is generally a question of the extent of the tort feasor's duty." 419 F.2d at 233.

According to the late Dean Prosser, many courts follow a rule commonly known as the "but for" rule in determining whether the defendant's conduct is a cause in fact of an event:

> The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it.

Prosser & Keeton, *Prosser & Keeton on Torts* § 41 P. 266 (5th ed. 1984) (footnote omitted). The "but for" rule is designed to exclude those cases where the particular event would have occurred even without the allegedly negligent act or omission. *Id.* at 265–266. In the same vein, it is well settled

that "[a]n act which merely furnishes the condition or occasion upon which injuries are revceived, but which does not put in motion the agency by or through which the injuries are inflicted, does not constitute the proximate cause of the harm." *Simmons v. Amerada Hess Corp.*, 619 F.2d 440, 441 (5th Cir.1980) (citation omitted).

■ In this case the district court found that the stevedore, Cooper, was negligent in failing to trim and compact the cargo of steam coal. Instead of trimming and compacting the coal, Cooper stowed the coal in the holds in a peaked fashion. At trial Cooper conceded that trimming and compacting the coal is a normal practice in the coal shipping industry. Trimming a cargo of steam coal usually involves leveling the coal throughout the hold using a tractor or bulldozer, which also compacts the coal. Trimming and compacting a cargo of steam coal is important because it reduces the surface area of the coal exposed to oxygen and thus reduces the chances of self heating.

The district court also found that Rex was negligent in ventilating the coal and in delaying the voyage. At trial the Master of the *M/V Kuniang,* Captain Calbes, testified that he knew that coal was susceptible to spontaneous combustion. Furthermore, the *M/V Kuniang's* owner instructions acknowledged the propensity of coal to combust spontaneously and accordingly warned the master to avoid "through ventilation" of the cargo holds. Despite these instructions the Master ventilated the coal aboard the *M/V Kuniang* in the Gulf of Mexico and, because of the grounding, opened the hatch covers in Miami for several days, in the tow to Norfolk for at least one or two days, and continually in Norfolk from April 21 to May 7. However, despite the ventilation of the cargo holds and Cooper's failure to trim and compact the coal, the *M/V Kuniang* could have reached Italy safely because, according to the vessel's own temperature records, the coal did not begin to heat until April 29 and did not become a problem until May 10. It is un-disputed that the *M/V Kuniang* was anticipated to arrive in Italy on April 20 or earlier had it not run aground.

At trial Dr. Berry testified that ventilation of the *M/V Kuniang's* cargo holds, especially when the coal was stowed in a peaked fashion, would drastically increase the chances of spontaneous combustion. According to Dr. Berry, the passage of air over the peaked piles of coal creates a "chimney effect" drawing air through the coal and exacerbating any potential for heating:

> The Court: Well, would this influx of fresh air cause the cargo to become more combustible or less?
>
> Dr. Berry: Yes, sir. It supplies an additional increment of oxygen that is necessary to bring it up, and if the coal is peaked in there, it—generally draws it up to the coal and the reaction is speeded up dramatically, and you should realize that for every ten-degree centigrade rise in the temperature of that cargo the rate of spontaneous combustion doubles.

Furthermore, Dr. Berry did not appear to criticize the presence of a substantial quantity of fines in any steam coal of two inches times zero and under. Instead, Dr. Berry testified that to minimize the possibility of heating the steam coal had to be intimately blended. He described intimate blending as a continuous long-term turning and mixing of the coal by tractors thoroughly intermingling fines with coal of greater size. Thus, Dr. Berry would criticize a cargo with even 10% to 20% fines if it was not intimately blended in the way he described.

Given the above-stated facts, we think that the district court was clearly in error in finding that the alleged negligence of Cravat and AOV in failing to warn the *M/V Kuniang's* Master about the relatively large percentage of fines in the coal and the danger of ventilation was a "contributing cause" of the damages Rex incurred in off-loading and storing the coal in Norfolk. The evidence clearly shows that the Master

of the *M/V Kuniang* was already aware that steam coal was susceptible to spontaneous combustion and that the *M/V Kuniang's* owner instructions had already warned him to avoid "through ventilation" of the cargo holds. Any warning Cravat or AOV could have given the Master of the *M/V Kuniang* would have added nothing to what the vessel's owner instructions had already instructed him not to do. There is no evidence that a cumulative warning would have altered the Master's actions in this case. Furthermore, the evidence is clear that even with Cooper's negligence in failing to trim and compact the coal and Rex's negligence in ventilating the cargo holds, the *M/V Kuniang* would still have arrived in Italy long before the coal began to heat but for Rex's negligence in delaying the voyage.

Thus, we conclude that the alleged negligence of Cravat and AOV in failing to warn the *M/V Kuniang's* master was not a cause in fact of Rex's damages. After carefully reviewing the record we are left with a definite and firm conviction that an error has been committed. The only reasonable conclusion that can be drawn from the evidence is that Rex's damage was caused by its negligence in delaying the voyage by allowing sea water to contaminate its lubricating oil, in running aground, and in violating the owner's instructions by continually ventilating the coal. Cooper was negligent in failing to trim and compact the coal and Rex's Master was aware of this. These were the acts that produced the combustion and the damages and without which they would not have occurred. The coal was inspected at least twice by two different testing companies prior to loading and found to be "in good exportable condition." The failure of Cravat and AOV to warn the *M/V Kuniang's* Master about the fines added nothing and could not be considered as a contributing cause. Accordingly, the judgment of the district court is

REVERSED.