442 F.3d 74
 CONTSHIP CONTAINERLINES, LTD., Plaintiff-Appellant,
Conti Zweite Cristallo Schiffarhrts GMBH & Co. KG Ms Contship France, NSB Niederelbe Schiffahrtsges MBH & Co Kg, Sveriges Angfartygs Assurans Forening, also known as The Swedish Club, Stewart Arthur Holmes, as underwriter for and on behalf of Lloyds Syndicates 724 & 2724, Christine E. Danbridge, Independent Insurance Co., Ltd., Liverpool and London Steamship Protection and Indemnity Association Limited, Bergens Skibsassuranseforening and Deutsch Versicherungs-Und Ruckversicherungs A.G., Plaintiffs,
v.
PPG INDUSTRIES, INC., Defendant-Appellee.
Docket No. 05-0267-CV.
 United States Court of Appeals, Second Circuit.
 Argued: October 17, 2005.
 Decided: March 21, 2006.
 
 John M. Woods (Joseph G. Grasso, on the brief), Thacher Proffitt & Wood LLP, New York, NY, for Plaintiff-Appellant Contship Containerlines.
 Stanley McDermott III (Camilo Cardozo, on the brief), DLA Piper Rudnick Gray Cary U.S. LLP, New York, NY, for Defendant-Appellee PPG Industries, Inc.
 Before: JACOBS, CABRANES, and SACK, Circuit Judges.
 DENNIS JACOBS, Circuit Judge.
 
 
 1
 This dispute arises from a fire aboard the Contship France, a carrier operated by plaintiff-appellant Contship Containerlines, Ltd. ("Contship"). The fire was caused by the overheating of a cargo of calcium hypochloride ("Cal Hypo") shipped by defendant-appellee PPG Industries, Inc. ("PPG"). Contship concedes awareness (based on published specifications) that Cal Hypo could ignite at temperatures over 55°C; and PPG concedes awareness that the cargo could ignite at lower temperatures. After a bench trial, the district court found that the proximate cause of the fire was Contship's failure to consider the impact of heat on the cargo when it stowed the cargo in a spot that sustained temperatures of at least 47°C. On appeal, Contship argues that the district court erred in dismissing its claims of strict liability and duty to warn. We affirm.
 
 BACKGROUND
 
 2
 This appeal considers whether a carrier may recover against a shipper in strict liability for loss caused by cargo that is known to be dangerous, and whether a shipper satisfies its duty to warn by disclosing the dangerous characteristics of cargo in less than specific terms.
 
 
 3
 Contship is an operator of ocean-going container vessels. PPG shipped 512 drums of Cal Hypo aboard the Contship France, which sailed from Charleston, South Carolina, in late September 1997. Upon the ship's arrival in Tahiti, a fire broke out. The source of the fire was one batch of Cal Hypo, consisting of 80 drums each weighing 425 pounds.
 
 
 4
 The particular type of Cal Hypo at issue, designated "UN 2880" by Department of Transportation regulations, is known to be flammable. When exposed to heat at or above its "critical temperature," Cal Hypo will generate heat from decomposition faster than the heat can dissipate, resulting in a "thermal runaway" that can ignite surrounding materials. The critical temperature of a given drum of Cal Hypo depends in part on the volume of the drum. The district court found, upon expert testimony, that the critical temperature for the 425-pound drums of Cal Hypo was 47°C.
 
 
 5
 According to the district court, the shipped Cal Hypo was heated to ignition due to two errors committed by the crew. First, the container that caught fire was stowed directly above the bottom center fuel tank, exposing the cargo to the heat generated by the normal flow of oil on a vessel. Second, the ship's fuel was heated to abnormally high temperatures, further raising the ambient temperature. As a result, the district court found, "temperatures at the floor of the hold above the tank top and below the container caused the temperatures in some of the drums to reach . . . at least 47°C, the self-accelerating decomposition temperature of the calcium hypochlorite hydrate." The fire was caused by 18 days of constant exposure to these conditions.
 
 
 6
 Contship undertakes to demonstrate that relevant industry guidelines provide a default maximum storage temperature of 55°C for Cal Hypo, and thereby afford assurance that Cal Hypo is safe at temperatures below that mark. Constship argues that it acted reasonably so long as it stowed Cal Hypo at temperatures below 55°C, and that PPG should be liable for not warning Contship that special care was needed for its shipment of (allegedly) unusually unstable Cal Hypo.
 
 
 7
 Relevant Department of Transportation regulations in force at the time of the fire incorporated the International Maritime Dangerous Goods ("IMDG") Code — adopted by the United Nations as an international regime for the classification and regulation of hazardous sea cargoes. See 49 C.F.R. § 171.12 (1998); 49 C.F.R. § 172.101 (1996). The IMDG Code required stowage of Cal Hypo "[a]way from sources of heat where temperatures in excess of 55°C for a period of 24 hours or more will be encountered." Contship interprets this standard as assuring safety below 55°C, rendering stowage reasonable at temperatures below 55°C in the absence of contrary advice from the shipper.
 
 
 8
 PPG acknowledges that it was aware before shipping that the critical temperature of its 425 pound Cal Hypo drums was lower than 55°C. Contship, therefore, alleges that PPG owed it a duty to warn, which PPG violated by failing to disclose the atypical and unsuspected danger of the shipped Cal Hypo. Alternatively, Contship alleges that PPG is strictly liable for shipping latently dangerous cargo.
 
 
 9
 PPG argues that the quoted regulation does not guarantee that temperatures below 55°C are safe for Cal Hypo, because Cal Hypo's critical temperature varies according to container size and therefore could not be stated categorically. PPG adds (and the district court agreed) that the IMDG Code, taken as a whole, bars storage of Cal Hypo near sources of extreme heat, such as fuel tanks. The district court found that "[s]towing [Cal Hypo] as Contship did, in violation of the [C]ode and atop a constant source of heat, was not a normal condition of transport. The stowage was equally improper for a product with an actual [critical temperature] of 55°C."
 
 
 10
 The District Court placed full blame on Contship:
 
 
 11
 The fire . . . was not caused by Contship stowing the cargo at an appropriate location for [a critical temperature] of 55 but inappropriate for 47°C, it was caused by Contship's stowage entirely disregarding the factor of heat. Nothing done or undone by PPG contributed in any way or degree to the fire on the Contship France. PPG adequately complied with all its obligations . . . .
 
 
 12
 Trial transcript at 1366 (emphasis added). Contship appeals both the district court's fault assessment, and the dismissal of the strict liability claim.
 
 DISCUSSION
 
 13
 This Court reviews the district court's findings of fact for clear error. Conclusions of law are reviewed de novo. Senator Linie GMBH & Co. KG v. Sunway Line, Inc., 291 F.3d 145, 151 (2d Cir.2002). Attributions of fault among the various parties are considered factual determinations and therefore are reviewed under the clearly erroneous standard. See Ching Sheng Fishery Co. v. United States, 124 F.3d 152, 157 (2d Cir.1997) ("A district court's finding on issues of causation and on its allocation of fault among negligent parties continues to be subject only to clearly erroneous review.").
 
 I.
 
 14
 Contship's strict liability claim is premised on its interpretation of the Carriage of Goods by Sea Act ("COGSA"), which distributes liability between shipper and carrier as follows:
 
 
 15
 [for g]oods of an inflammable, explosive or dangerous nature to the shipment whereof the carrier . . . has not consented with knowledge of their nature and character . . . the shipper of such goods shall be liable for all damages and expenses directly or indirectly arising out of or resulting from such shipment.
 
 
 16
 46 U.S.C.App. § 1304(6) (2004) (emphasis added). Is strict liability a claim available to a carrier that knew the cargo was flammable but had reason to think that it was safe enough under the conditions of stowage?
 
 
 17
 Under COGSA, dangerousness is an aspect of a cargo's "nature and character." The shipper's knowledge seems to be no consideration: Shippers are strictly liable for loss caused by inherently dangerous shipments where neither the shipper nor the carrier appreciates that the cargo is inherently dangerous. Senator Linie, 291 F.3d at 148.
 
 
 18
 We conclude that a carrier cannot invoke strict liability if it knows that a cargo poses a danger and requires gingerly handling or stowage, and nevertheless exposes the cargo to the general condition that triggers the known danger, regardless of whether the carrier is aware of the precise characteristics of the cargo. This principle is implicit in Senator Linie (relied on by Contship), which considered generally whether the carrier (or shipper) was "on notice that an exothermic reaction. . . was possible." Id. at 152 (internal quotation marks omitted). In such a binary analysis, a party either will know that such a reaction is possible or it will not; the calibrated likelihood of an exothermic reaction under a variety of heat circumstances is not considered. Senator Linie reinforces that dichotomy in another passage, which considers whether the cargo was "considered a stable compound" on the one hand, or deemed "inherently dangerous" on the other. Id. at 149, 152-53, 156. A carrier that exposes a cargo to heat with knowledge of its flammability may or may not ultimately prevail — depending on the particulars of what it and the shipper knew and their respective duties — but it cannot prevail on strict liability. See Ionmar Compania Naviera, S.A. v. Olin Corp., 666 F.2d 897, 904-05 (5th Cir.1982) (concluding that the liability of a shipper for a fire caused by Cal Hypo depended on whether shipper negligently violated its duty to warn of dangers the carrier could not reasonably have been expected to know).
 
 
 19
 In this case, such a "nature and character" inquiry defeats Contship's strict liability claim. The "nature and character" of Cal Hypo is that it is flammable at elevated temperatures. Knowing Cal Hypo's tendency to lose thermal stability when heated, Contship stowed it in a superheated spot. Contship may not invoke strict liability where it brought about the very danger it knew to lie latent in its cargo.
 
 II.
 
 20
 In the alternative, Contship argues that PPG's superior knowledge as to Cal Hypo's specific dangerousness at temperatures under 55°C created a duty to warn under COGSA's negligence provision: "The shipper shall not be responsible for loss or damage sustained by the carrier or the ship arising or resulting from any cause without the act, fault, or neglect of the shipper . . . ." 46 U.S.C.App. § 1304(3) (2004) (emphasis added).
 
 
 21
 A shipper's failure to adequately inform a carrier of the foreseeable dangers posed by cargo can constitute a negligent failure to warn under § 1304(3). As the Fourth Circuit has explained, "[u]nder general maritime law a shipper has a duty to warn the stevedore and the ship owner of the foreseeable hazards inherent in the cargo of which the stevedore and the ship's master could not reasonably have been expected to be aware." Ente Nazionale Per L'Energia Electtrica v. Baliwag Navigation, Inc., 774 F.2d 648, 655 (4th Cir. 1985); see also O'Connell Mach. Co. v. M.V. "Americana", 797 F.2d 1130, 1134 (2d Cir.1986) (shippers have "an obligation to inform the carrier of special requirements regarding stowage location"). However, liability for a supposedly negligent omission is inappropriate where "the particular event would have occurred even without the allegedly negligent . . . omission." Ente Nazionale, 774 F.2d at 655. Thus, liability for failure to warn is only appropriate if there is evidence that a "warning would have altered the [carrier's] actions." Id. at 657.
 
 
 22
 Contship's negligent-failure-to-warn claim requires two showings: (1) that PPG failed to warn Contship about dangers "inherent in the cargo of which the stevedore and ship's master could not reasonably have been expected to be aware"; and (2) that an absent warning, if given, would have impacted stowage.
 
 
 23
 1. Could Contship reasonably be expected to know the inherent dangers of PPG's Cal Hypo cargo? Professional carriers might be reasonably expected to exercise caution, and not stow flammable compounds in the hottest hold on a ship, at temperatures exceeding 47°C — that is, 115°F; but Contship emphasizes the supposedly reliable stability of Cal Hypo at or below 55°C, absent circumstances that PPG knew and Contship did not. This argument is dubious.
 
 
 24
 Contship concedes that it could be expected to be aware of dangers detailed in the IMDG Code. Several provisions of the Code give notice to carriers that Cal Hypo is dangerous at temperatures approaching 55°C. Thus, the IMDG Code advises carriers to stow potentially unstable materials with critical temperatures over 35°C in conditions at least ten degrees cooler than the critical temperature. See In re M/V DG Harmony, 394 F.Supp.2d 649, 659 (S.D.N.Y.2005)("The IMDG Code provides that cargo having an SADT [Self Accelerating Decomposition Temperature] of `over 35°C' (95°F) must be transported at a `control temperature' of 10°C less than the SADT."). Contship's contention that it could reasonably expect danger only at or above the critical temperature of 55°C is undermined by the cited warning in the IMDG Code against stowage at temperatures greater than 45°C.
 
 
 25
 That said, we need not decide this appeal by interpreting which dangers are conveyed by a reasonable reading of the IMDG Code, because the district court's findings on the issue of causation are fatal to Contship and are not clearly erroneous. See Fed.R.Civ.P. 52(a) ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous . . . .").
 
 
 26
 2. The district court found that Contship was unconcerned with the effect of heat on Cal Hypo, and that additional warnings therefore would not have averted the loss. Specifically, the district court found that "Contship's stowage entirely disregard[ed] the factor of heat" due to the Contship stowage planner's "unfortunate belief that his function was only to designate whether stowage should be above or below deck." Contship's dangerous goods coordinator believed that Cal Hypo could be carried "under deck without any real consideration as to its position in the stow." Seemingly acting on this belief, Contship stowed the flammable, heat-sensitive Cal Hypo near the heated fuel tank, an area of the ship maximally subjected to fluctuations of heat. As no one involved in stowing Cal Hypo was much concerned with the IMDG Code's 55°C warning, the court did not err in finding that no one at Contship would have reacted to warnings of a somewhat lower critical temperature.
 
 
 27
 The likely effect of a warning is a fact question best left to the finder of fact. Since the district court's finding on this point is not clearly erroneous, the court properly dismissed Contship's claim for negligent failure to warn under § 4(3) of COGSA.
 
 CONCLUSION
 
 28
 We have considered the parties' remaining arguments and find each of them to be without merit. For the foregoing reasons, the judgment of the district court is affirmed.