**SENATOR LINIE GMBH & CO. KG, a/k/a Senator Lines, Plaintiff–Appellant,**

v.

**SUNWAY LINE, INC. and Zen Continental Co., Inc., Defendants–Third–Party–Plaintiffs–Cross–Defendants–Appellees,**

**China National Chemicals Import & Export Corporation, a/k/a Tianjin Chemicals Import & Export Corporation, Defendant–Third–Party–Defendant–Appellee,**

**Itochu Specialty Chemicals Inc., Defendant–Cross–Claimant,**

**Aceto Corporation, Defendant,**

**Dinzhou Phosphoric Fertilizer Factory, Defendant–Cross–Defendant,**

**Eastern Sunway Line, Inc., Defendant–Cross–Defendant–Appellee.**

Docket No. 01–7374.

United States Court of Appeals, Second Circuit.

Argued: Nov. 13, 2001.

Decided: May 17, 2002.

Stephen H. Vengrow, Cichanowicz, Callan, Keane, Vengrow & Textor, LLP, New York, N.Y., for Plaintiff–Appellant.

Nicholas E. Pantelopoulos, Beidermann, Hoenig, Massamillo & Ruff, P.C., New York, N.Y. (Christopher Losquadro, on the brief), for Defendants–Appellees.

Before: SOTOMAYOR, KATZMANN, and B.D. PARKER, JR., Circuit Judges.

SOTOMAYOR, Circuit Judge.

This appeal poses the question of whether, under § 4(6) of the U.S. Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. § 1304(6), a shipper may be held strictly liable for damages and ex-

penses resulting directly or indirectly from shipments of inherently dangerous goods when neither the shipper nor the carrier had actual or constructive preshipment knowledge of the goods' dangerous nature. Plaintiff-appellant Senator Linie GMBH & Co. KG ("Senator"), which incurred damages arising from the spontaneous combustion of a chemical cargo aboard its ship, the M/V Tokyo Senator, argues that defendants-appellees shippers (collectively, "the Shippers" or "defendants-appellees") are liable under § 1304(6) even if, prior to the shipment, they did not know and could not have known that the chemical cargo was inherently dangerous.

The Shippers respond by arguing that § 1304(6) sets forth a negligence- or knowledge-based rule and that liability under that provision may be imposed only if Senator can show that the Shippers had actual or constructive preshipment knowledge of the inherent danger of the chemical cargo. The Shippers further contend that § 1304(6) codified a well-settled federal maritime common-law rule that shippers could not be held to give an absolute warranty for the fitness of cargo, and that in 1936, when COGSA was enacted, this rule was chiefly represented by a decision of this Court, *The Wm. J. Quillan*, 180 F. 681 (2d Cir.1910). We disagree.

An examination of the plain meaning of the statute reveals that § 1304(6) sets forth a risk-allocating rule that renders a shipper strictly liable for damages in the event that neither the shipper nor the carrier knew or should have known that shipped goods were inherently dangerous. Contrary to the Shippers' position, we are unpersuaded that COGSA, which "represents the codification of the United States' obligations under the International Convention for the Unification of Certain Rules of Law Relating to Bills of Lading [the 'Hague Rules']," *J.C.B. Sales Ltd. v. Wallenius Lines*, 124 F.3d 132, 134 (2d Cir.1997), incorporated the shipper liability rule set forth in *Quillan*. As discussed below, while the history of COGSA and the Hague Rules is largely silent as to the kind of liability that the drafters intended when they adopted § 1304(6), that history is not inconsistent with a rule of strict liability for shippers of inherently dangerous goods.

Even if COGSA legislators had set out to codify general maritime law, they would have found no firmly established rule of shipper liability in the dangerous-goods context. Pre COGSA case law reflected disagreement over the nature and scope of such liability. In light of this unsettled law, and because § 1304(6) speaks directly to the issue of shipper knowledge and liability, we conclude—as did the House of Lords in *Effort Shipping Co. v. Linden Mgt. SA*, [1998] A.C. 605 (H.L.1998), with respect to the British counterpart of § 1304(6)—that enactment of § 1304(6) established a rule of strict liability for a shipper of inherently dangerous goods when neither the shipper nor the carrier had actual or constructive preshipment knowledge of the danger. This construction of § 1304(6) is consonant with COGSA's goals of fostering international uniformity in sea-carriage rules and allocating risk between shippers and carriers in a manner that is consistent and predictable.

■ Application of § 1304(6) to the unusual facts of this case presents an issue of first impression in this Circuit. Because this case involves the rare circumstance in which neither party had actual or constructive preshipment knowledge of the cargo's inherently dangerous nature, we hold that the Shippers are strictly liable for the damages incurred by Senator. We therefore vacate that part of the district court's judgment granting the Shippers' motions for judgment, and remand for proceedings consistent with this opinion.

## BACKGROUND

The stipulated facts in the parties' Joint Pretrial Order together with the district court's factual findings form the basis of the following summary.

On April 28, 1994, a fire broke out in the forward hold of the M/V Tokyo Senator (the "Tokyo Senator") as she made for the coast of Norfolk, Virginia. The vessel was bound from Pusan, Republic of Korea, where she had taken on a cargo of 300 drums of thiourea dioxide ("TDO") originally exported from the People's Republic of China. At about 10:30 pm on April 28, the captain observed smoke coming from hold number 2, in which the TDO container was stowed. The contents of the TDO container were emitting heat, smoke, and chemical residue. After the fire had been brought under control, a fire expert, discovering that a number of TDO drums were charred, concluded that the fire had broken out within the TDO container. In a separate but related action in the Southern District of New York, Judge Lynch noted that "at least one of the thiourea dioxide drums spontaneously ignited. Other containers then caught fire...." *Zen Continental Co., Inc. v. Intercargo Ins. Co.*, 151 F.Supp.2d 250, 255 (S.D.N.Y. 2001).

TDO is a white, odorless powder used as a reducing agent and in the bleaching of protein fibers such as paper, paper pulp, and textiles. At the time of the shipment in question, TDO was considered a stable compound under normal conditions.[1] According to trial testimony which the dis-

---

1. The TDO in this case had been manufactured by an entity based in China, the Dinzhou Phosphoric Fertilizer Factory ("Dinzhou"), which sold 30 tons of the chemical to defendant-appellee China National Chemicals Import & Export Corp. ("Sinochem"). The 30 tons of TDO were placed in drums at the Dinzhou facility in January 1994. In March 1994, Sinochem sold 15 tons of the TDO to a U.S. importer, Itochu Specialty Chemicals Inc. ("Itochu"), and employed defendant-appellee Zen Continental Co., Inc. ("Zen"), a non-vessel operating common carrier ("NVOCC") and freight forwarder, to arrange for the booking, containerization, and carriage of the TDO shipment from China to Norfolk.

Zen booked a "feeder" ocean carrier to transport the TDO from the origin port of loading in Tianjin, China, to the transshipment port in Pusan, Korea. The bill of lading covering the transshipment from Tianjin to Pusan identified Zen as the "Shipper" and defendant-appellee Eastern Sunway Line, Inc. ("Eastern Sunway") as the "Consignee." Zen, as a NVOCC, also issued a bill of lading that covered carriage of the TDO from Tianjin to Norfolk, and named Sinochem as the "Shipper" and Itochu as the "Notify" party. Both Sunway and Eastern Sunway were "apparent subsidiaries" of Zen. *Intercargo Ins. Co.*, 151 F.Supp.2d at 255.

On or about March 25, 1994, Eastern Sunway, acting as Zen's Korean agent, issued a shipping order requesting that Senator carry the containerized TDO shipment from Pusan to Norfolk aboard its vessel, the Tokyo Senator, and identified Eastern Sunway as the "Shipper/Exporter"; defendant-appellee Sunway Line, Inc. ("Sunway") as the "Consignee"; and Sunway as the "Notify" party. Senator's bill of lading showed the same identifications and stated that the container holding the TDO was "SHIPPER'S LOAD AND COUNT." The reverse side of the bill of lading was stamped by Zen and signed by Sunway.

The district court entered a default judgment against Dinzhou for the full amount of Senator's proven damages, plus costs. *Ins. Co. of N. Am. v. M/V Tokyo Senator*, No. 95 Civ. 3303, 96 Civ. 0008, 2001 WL 238293, at *5 (S.D.N.Y. Mar.9, 2001). Dinzhou is not participating in this appeal. Both Itochu and Aceto Corporation, defendants below, were U.S. purchasers and importers of the TDO cargo. Prior to trial, Senator voluntarily discontinued its action against these two parties. Senator does not appeal from that part of the district court's judgment dismissing its claims against Eastern Sunway.

trict court in the instant case found credible, the fire resulted from an exothermic (or heat-releasing) reaction within the container holding the TDO drums. *M/V Tokyo Senator*, 2001 WL 238293, at *1. Although there are several possible causes of an exothermic reaction in TDO—including exposure to excessive heat or to moisture[2]—the district court found that the plaintiffs[3] below had failed to establish the actual cause of the exothermic reaction or that any particular party was responsible. *Id.*[4] The fire resulted in damage to the vessel and other cargo. At trial, Senator proved damages in the amount of $439,785.88. *Id.* at *3. The district court found that defendants-appellees Zen, Sinochem, Sunway, and Eastern Sunway were all shippers in relation to Senator. *Id.* at *1, *4.[5] Defendants-appellees do not dispute this finding.

At the time of the shipment in this case, TDO was not named as a hazardous or dangerous cargo in the International Maritime Dangerous Goods Code ("IMDGC") or in the Department of Transportation Hazardous Materials Table. *Id.* at *2. It was not until 1998 that TDO was specifically listed as a hazardous or dangerous material in the IMDGC, and not until 1999 that TDO was listed as a dangerous cargo in the Code of Federal Regulations. The district court found, moreover, that at the time of the incident aboard the Tokyo Senator, "the vast majority of the available literature did not describe an exothermic reaction as a likely result of the decomposition of TDO." *M/V Tokyo Senator*, 2001 WL 238293, at *1. In a faxed message dated March 18, 1994—a little more than a month before the incident—Senator's Marine Operation Department for Dangerous Goods in Bremen advised Senator's San Francisco office: "ACCORDING TO ALL AVAILABLE INFORMATION THIS PRODUCT [TDO] IS NOT CLASSIFIED

2. The district court found "extremely credible" the testimony of a chemistry expert that without exposure to "high temperature," an exothermic reaction could not have occurred. *M/V Tokyo Senator*, 2001 WL 238293, at *1. Yet the court also found credible the testimony of another expert that he "could not identify the actual cause of the reaction of the TDO in this case, but believed by process of elimination that there was probably some feature in the cargo itself which was responsible." *Id.* at *2. The court did not conclude that any external source of heat or humidity caused the exothermic reaction.

3. The action below consolidated two cases: a suit by Senator against the Shippers, and a suit by the Insurance Company of North America against Senator and several other parties. This appeal involves the former lawsuit only.

4. The parties devote significant attention in their briefs to the issue of causation-that is, whether the fire was caused by the inherent propensities of TDO or by some external source. However, in light of (1) the undisputed fact that TDO is now recognized as a hazardous material capable of combustion under various circumstances, and (2) the district court's elimination of typical external causes—such as crew error, improper stowage, or a defect in the design or manufacture of the TDO, *M/V Tokyo Senator*, 2001 WL 238293, at *2—it appears likely that the fire resulted, directly or indirectly, from the TDO's inherently dangerous character. Further, a relaxed view of causation under these circumstances is consistent with the language of 46 U.S.C.App. § 1304(6)—the dangerous-goods provision at the center of this case—which provides that the "shipper of [dangerous] goods shall be liable for all damages and expenses directly or indirectly arising out of or resulting from such shipment."

5. Under COGSA, Zen qualified as a shipper in its capacity as a NVOCC. 46 U.S.C.App. § 1702(17)(B) & (21)(E). In addition, the district court found that Sunway, which was described as a "Consignee" and a "Notify" party in Senator's bill of lading and in Eastern Sunway's shipping order, was also a shipper. *M/V Tokyo Senator*, 2001 WL 238293, at *1, *4.

IS [*sic*] HAZARDOUS FOR SEA TRANSPORT." The TDO shipment was not listed on the Tokyo Senator's hazardous cargo manifest. A note from Sinochem, addressed to "Steamship Company," advised that "[o]ur merchandise are all regular chemicals, not hazardous."

The district court noted that only one contemporaneous document submitted by the plaintiffs below—a technical data report on TDO prepared by the FMC Corporation (the "FMC document") and alleged by the plaintiffs to have been in the defendant shippers' possession one day after the fire-referred to TDO in connection with an exothermic reaction. The court found no evidence, however, that the FMC document had been available in the People's Republic of China at the time of the accident, and further found that the document stated only that contact of reducing agents with chemicals similar to TDO, such as hydrogen peroxide, can result in an exothermic reaction. *M/V Tokyo Senator*, 2001 WL 238293, at *1. The court concluded that "[n]one of the literature received into evidence was sufficient to put any party on notice that an exothermic reaction of the severity of the one in this case was possible during the transport of the TDO." *Id.*

The district court granted the Shippers' motion for judgment with respect to Senator's claims, holding, *inter alia*, that 46 U.S.C.App. § 1304(6) does not impose liability on a shipper of inherently dangerous goods unless it can be shown that the shipper actually or constructively knew of the dangerous nature of the cargo prior to shipment and failed to disclose that nature to the carrier. *M/V Tokyo Senator*, 2001 WL 238293, at *4. The court further held that general maritime law in the Second Circuit and the United Kingdom, as reflected in *Quillan*, 180 F. at 682–84, and *Brass v. Maitland*, [1856] 6 El. & Bl. 470

(Q.B.1856), did not impose an absolute warranty on the part of the shipper that its cargo was not hazardous. *M/V Tokyo Senator*, 2001 WL 238293, at *4. Having determined that neither COGSA nor the general maritime law imposes liability on a shipper of dangerous goods absent the shipper's knowledge of the danger, the court granted the Shippers' motions for judgment because Senator had not proven by a preponderance of the credible evidence that the Shippers "knew or should have known based on the knowledge in the industry, that TDO could decompose exothermically." *Id.* This appeal followed.

## DISCUSSION

### I. Jurisdiction and Standard of Review

■ The district court had jurisdiction of this admiralty action pursuant to 28 U.S.C. § 1333(1). The court entered final judgment on March 29, 2001, with respect to the claims now on appeal, and we exercise jurisdiction pursuant to 28 U.S.C. § 1291. This Court reviews a district court's findings of fact for clear error and its conclusions of law *de novo*. *Thypin Steel Co. v. Asoma Corp.*, 215 F.3d 273, 277 (2d Cir.2000); *Ezekwo v. New York City Health & Hosps. Corp.*, 940 F.2d 775, 780 (2d Cir.1991); *see also. McAllister v. United States*, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20 (1954) ("No greater scope of review is exercised by the appellate tribunals in admiralty cases than they exercise under Rule 52(a) of the Federal Rules of Civil Procedure."); *Venus Lines Agency, Inc. v. CVG Int'l Am., Inc.*, 234 F.3d 1225, 1228 (11th Cir.2001) ("We review a district court's factual findings when sitting without a jury in admiralty under the clearly erroneous standard [and] the district court's conclusions of law *de novo*.") (internal citations omitted). Factual findings of the district court "will not be set aside unless they are without adequate support

in the record, are against the clear weight of the evidence, or are the product of an erroneous view of the law." *Ezekwo,* 940 F.2d at 780.

## II. The Parties Lacked Knowledge of TDO's Dangerous Nature.

Because we are asked to determine whether a shipper's liability for damages under 46 U.S.C.App. § 1304(6) arises when neither the shipper nor the carrier had actual or constructive preshipment knowledge of the cargo's inherently dangerous nature,[6] we must address, as a threshold matter, the parties' contentions regarding what was known or knowable about TDO at the time of the shipment in April 1994. On appeal, Senator argues that the district court clearly erred in finding that the FMC document did not put the Shippers on actual or constructive notice of TDO's dangerous nature. Specifically, Senator contends that Zen telefaxed the FMC document to Senator at the latter's request on April 29, 1994—one day after the fire aboard the Tokyo Senator—and that Zen's possession of the document at that time raises a presumption that it possessed the document before the incident. The Shippers reply that the document faxed by Zen on April 29, 1994, was not the FMC document at all, but an entirely different material safety data sheet dated July 9, 1993. The latter document described TDO as ordinarily a "stable compound [*sic* ]" that should not be exposed to high temperatures, humidity, or direct light, but it did not characterize TDO as a dangerous or hazardous chemical and did not mention any propensity of TDO to react exothermically or to ignite spontaneously.

We find no clear error in the district court's conclusion that "[n]one of the literature received into evidence was sufficient to put any party on notice that an exothermic reaction of the severity of the one in this case was possible during the transport of the TDO." *M/V Tokyo Senator,* 2001 WL 238293, at *1. None of the documents reproduced in the record on appeal indicates that the maritime industry in April 1994 considered TDO to be an inherently dangerous chemical capable of spontaneous exothermic reaction or combustion. With respect to the parties' arguments concerning the FMC document and the material safety data sheet, the Shippers' position appears to be the more persuasive one. The copy of the July 1993 material safety data sheet submitted at trial bears the fax line, "04–29–1994 12:34PM FROM ZEN–NYC," whereas the FMC document bears the fax line, "05/23/94 14:00:48." Although the parties' briefs do not discuss the significance or authenticity of the fax lines, these dates tend to support the Shippers' contention that it was the material safety data sheet, and not the FMC document, that Zen faxed to Senator one day after the fire aboard the Tokyo Senator.

Even if the FMC document was in the Shippers' possession prior to the mishap, Judge Cedarbaum did not clearly err in holding that the Shippers lacked knowledge of TDO's dangerous propensities. The court found that the FMC document stated only that contact of reducing agents with chemicals similar to TDO, such as hydrogen peroxide, could result in an exothermic reaction. *M/V Tokyo Senator,*

---

**6.** We do not address the issue of whether, in the event that a shipper had preshipment knowledge of the goods' dangerous nature and did not inform the carrier of the danger, the shipper's liability would arise under § 1304(6) or instead under 46 U.S.C.App. § 1304(3), which states: "The shipper shall not be responsible for loss or damage sustained by the carrier or the ship arising or resulting from any cause without the act, fault, or neglect of the shipper, his agents, or his servants."

2001 WL 238293, at *1. Thus, even if the Shippers did possess and fax the FMC document on the day after the fire, the court did not clearly err in concluding that the document failed to provide notice of TDO's inherently dangerous character. In sum, no clear error existed in the district court's finding that neither the Shippers nor Senator had actual or constructive pre-shipment knowledge of the inherently dangerous nature of TDO.

### III. A Shipper's Liability Under 46 U.S.C.App. § 1304(6) Does Not Require Its Actual or Constructive Knowledge of the Inherent Danger of Shipped Goods.

The U.S. Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. §§ 1300 *et seq.*, which "represents the codification of the United States' obligations under [the 'Hague Rules']," *J.C.B. Sales Ltd.*, 124 F.3d at 134, was enacted in 1936 and "applies *ex proprio vigore* to all contracts for carriage of goods by sea between the ports of the United States and the ports of foreign countries," *Nippon Fire & Marine Ins. Co. v. M.V. Tourcoing*, 167 F.3d 99, 100 (2d Cir.1999) (citing 46 U.S.C.App. §§ 1300, 1312). Because the instant case involves cargo shipped by sea under bills of lading between the Republic of Korea and the United States, COGSA applies. *See* 46 U.S.C.App. § 1300 ("Every bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea to or from ports of the United States, in foreign trade, shall have effect subject to the provisions of this chapter.").

Although the district court concluded, and defendants contend, that 46 U.S.C.App. § 1304(6) imposes liability on a shipper of inherently dangerous goods only if it can be shown that the shipper had actual or constructive preshipment knowledge of the dangerous nature of the goods, a close analysis of § 1304(6) leads us to reject such a shipper *scienter* requirement. To determine whether shipper liability under § 1304(6) is strict or knowledge-based, we begin by examining the plain meaning of the statutory provision together with the few cases interpreting it. We then survey the legislative purpose and history of COGSA. Inasmuch as the language of COGSA was "lifted almost bodily from the Hague Rules," *Robert C. Herd & Co. v. Krawill Mach. Corp.*, 359 U.S. 297, 301, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959), we examine as well the history of the Hague Rules and certain early model provisions that preceded the Hague Rules and COGSA. We then turn to the general maritime law of shipper liability in the dangerous-goods context as set forth in pre-COGSA American and British case law, and inquire whether in 1936 federal maritime common law had firmly settled the question of whether a shipper's liability for dangerous goods was strict or knowledge-based. In this regard, we give special attention to *The Wm. J. Quillan*, 180 F. 681 (2d Cir. 1910). Finally, we ask whether COGSA § 1304(6) codified the general maritime law concerning shipper liability in the dangerous-goods context.[7]

---

7. We note that, to the extent COGSA is based on the Hague Rules, the analytical approach outlined above is consistent with our framework for interpreting treaties and international agreements. *See Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.*, 186 F.3d 210, 215 (2d Cir.1999) ("Treaties are construed in much the same manner as statutes."); *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 93 (2d Cir. 1999) ("The starting point in construing a treaty is its text.") (citing *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 534, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991)); *see also* Vienna Convention on the Law of Treaties, May 23, 1969, art. 31.1, 1155 U.N.T.S. 331, 340

## A. Plain Meaning and the COGSA Case Law

■ We begin, as we must, with the language of the statute. *Williams v. Taylor*, 529 U.S. 420, 431, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000); *Smaldone v. Senkowski*, 273 F.3d 133, 136 (2d Cir.2001); *see also Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) ("There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes.") (internal quotation marks omitted). Section 1304(6) reads, in relevant part:

> Goods of an inflammable, explosive, or dangerous nature to the shipment whereof the carrier, master or agent of the carrier, has not consented with knowledge of their nature and character, may at any time before discharge be landed at any place or destroyed or rendered innocuous by the carrier without compensation, and the shipper of such goods shall be liable for all damages and expenses directly or indirectly arising out of or resulting from such shipment.[8]

The only reference to "knowledge" in this provision implicates the carrier. A plain-meaning approach would suggest that it is the carrier's knowledge of the goods' dangerous nature, not the shipper's, that conditions shipper liability. *Cf.* William Tetley, *Marine Cargo Claims* 465 (3d ed.1988) (noting that, according to Article 4(6) of the Hague Rules, from which the language of § 1304(6) derives, "the shipper is responsible for *all* the consequences of having shipped dangerous goods whether he knew of their nature or not. His only defence is that the carrier knew or should have known of their dangerous nature.").

Instead of employing a plain-meaning approach, however, the district court in the instant case concluded that under § 1304(6), "a shipper that *knowingly* ships hazardous cargo without disclosing the hazardous nature of the cargo to the carrier will be liable for damage that results regardless of whether it otherwise exercised due care." *M/V Tokyo Senator*, 2001 WL 238293, at *4 (emphasis added). To support this importation of a shipper *scienter* requirement into the text of § 1304(6), the court pointed to the only other decision in this circuit to address § 1304(6) directly, *Borgships Inc. v. Olin Chemicals Group*, No. 96 Civ. 6734, 1997 WL 124127 (S.D.N.Y. Mar.19, 1997). In *Borgships*, a carrier had sued a shipper under § 1304(6) as a result of the shipper's failure to warn the carrier of a hazardous chemical that led to a shipboard fire in the port of Barcelona. The court ruled that the shipper's compliance with certain Department of Transportation regulations did not, as a matter of law, satisfy the shipper's duty to warn, and that the carrier had therefore stated a cause of action under COGSA. *Id.* at *4.

In interpreting the scope of the shipper's duty under the parties' bills of lading, the *Borgships* court exited from COGSA and relied instead on general maritime law for the proposition that "a shipper is not

---

("A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."); Restatement (Third) of Foreign Relations Law § 325(1) (1987) (same).

**8.** The remainder of § 1304(6) reads as follows: "If any such goods shipped with such knowledge and consent [of the carrier, master or agent of the carrier] shall become a danger to the ship or cargo, they may in like manner be landed at any place, or destroyed or rendered innocuous by the carrier without liability on the part of the carrier except to general average, if any."

held to an absolute warranty with respect to the safe nature of its cargo, but rather is chargeable only with that knowledge actually or constructively within its possession." *Id.*[9] *Borgships* did not discuss or expressly rely on *Quillan*, but it did note parenthetically that *Quillan* had been cited by *Sucrest Corp. v. M/V Jennifer*, 455 F.Supp. 371 (D.Me.1978), which similarly found that the maritime common law requires shipper *scienter* in the dangerous-goods context.[10] Although *Borgships* implies that COGSA § 1304(6) incorporates general maritime law, the *Borgships* court did not address the fundamental question of whether § 1304(6) codifies preexisting maritime common law on this issue. Moreover, *Borgships* subjected the carrier's separate claim for negligent failure to warn to the same analysis that it had used for the carrier's § 1304(6) claim, *Borgships*, 1997 WL 124127, at *4, thus eliding, again without discussion, any distinction between COGSA and the general maritime law. The few other courts to address § 1304(6) have not reached the specific question of strict liability, but instead disposed of the issue on alternative grounds.[11]

The district court in the instant case further concluded that "[t]he general rule under COGSA is that 'a shipper shall not be responsible for loss or damage sustained by the carrier or the ship ... without the act, fault, or neglect of the shipper.' 46 U.S.C.App. § 1304(3)." *M/V Tokyo Senator*, 2001 WL 238293, at *4. It is true that § 1304(3) of COGSA sets forth a basic fault- or negligence-based theory of shipper liability.[12] This "gener-

9. We note that *Borgships* and certain other decisions discussed in this opinion have not paid sufficient attention to the language of COGSA. *Cf.* Michael F. Sturley, *The Fair Opportunity Requirement Under COGSA Section 4(5): A Case Study in the Misinterpretation of the Carriage of Goods by Sea Act*, 19 J. Mar. L. & Com. 1, 2–3 (1988) ("American courts have paid remarkably little attention to COGSA's plain language when that language has been inconsistent with American judicial doctrines that developed before COGSA's enactment.").

10. The district court in the instant case also cited *Sucrest*. But in *Sucrest*, which involved a carrier's counterclaim against a sugar-cargo owner for hull damage and other expenses, the court determined that the charter party, and not COGSA, governed the rights and liabilities of the parties. *Sucrest*, 455 F.Supp. at 380 n. 16. Having so determined, the court applied general maritime law to the question of a cargo owner's duty to warn of inherent dangers of cargo. *Id.* at 384–85. Moreover, the parties had agreed that "the governing standards of COGSA and of the charter party are similar in all presently material respects," *id.* at 380 n. 16, and the carrier "[did] not argue that the cargo owner warrants absolutely that the cargo contains no inherent dangers unknown to the shipowner," *id.* at 385 n. 20. Therefore, *Sucrest* did not address the relationship of COGSA to general maritime law and did not discuss § 1304(6).

11. *See Ente Nazionale Per L'Energia Elettrica v. Baliwag Navigation, Inc.*, 605 F.Supp. 355, 363 (E.D.Va.1984) (assuming *arguendo* that the coal shipment at issue was "dangerous" and "inflammable" within the meaning of § 1304(6), the court concluded that the shipowner did not prove that the ship's master lacked knowledge of the cargo's susceptibility to spontaneous combustion), *rev'd on other grounds*, 774 F.2d 648 (4th Cir.1985); *The Stylianos Restis*, 1974 A.M.C. 2343 (S.D.N.Y. 1972) (ruling that a cargo of fishmeal was not dangerous within the meaning of § 1304(6) and that the carrier gave informed consent to the carriage); *Skibs A/S Gylfe v. Hyman–Michaels Co.*, 304 F.Supp. 1204, 1221 (E.D.Mich.1969) (finding no liability under § 1304(6), because the carrier was aware, prior to loading, of the hazard posed by a cargo of steel turnings), *aff'd*, 438 F.2d 803 (6th Cir.1971).

12. The provision reads in its entirety: "The shipper shall not be responsible for loss or damage sustained by the carrier or the ship arising or resulting from any cause without the act, fault, or neglect of the shipper, his agents, or his servants." 46 U.S.C.App. § 1304(3).

al rule" is in tension, however, with the specific rule for a shipper's dangerous-goods liability under § 1304(6). U.S. courts considering facts involving dangerous cargoes or injurious events aboard ships have been surprisingly silent on the interplay of §§ 1304(3) and 1304(6).[13] It may be that the cargoes or conditions in those cases were not deemed inherently dangerous, or that the parties did not plead § 1304(6) as a cause of action. In any event, courts in the United States simply have not examined the text of § 1304(6) either on its own terms or in the light of its history and policy.

In contrast, the British House of Lords in *Effort Shipping Co. v. Linden Mgmt. SA*, [1998]´A.C. 605 (H.L.1998), addressed the relationship between Articles 4(3) and 4(6) of the Hague Rules, the identically-worded U.K. counterparts of our

§§ 1304(3) and 1304(6).[14] In *Effort Shipping*, a cargo of ground-nut extractions had been shipped by ocean carrier from Senegal to the Dominican Republic. Unknown to both the shippers and the carriers, the ground-nut cargo was infested with Khapra beetle at the time of shipment, and the contamination resulted in expensive delays, fumigations, and cargo-dumping. On appeal from the Court of Appeal, the House of Lords held that where none of the parties had knowledge of the dangerous infestation, U.K.'s Article 4(6) imposed strict liability on the shippers. In reaching this conclusion, Lord Lloyd of Berwick undertook a close textual analysis of the dangerous-goods provision. He began by observing that, in the first half of the first sentence, the right of the carrier to render innocuous or to destroy

---

**13.** *See, e.g., Williamson v. Compania Anonima Venezolana De Navigacion*, 446 F.2d 1339, 1341 (2d Cir.1971) (holding that under § 1304(3), shipper need not supply absolutely safe container on which longshoremen or crew may walk, but need only avoid negligence; § 1304(6) not mentioned); *Excel Shipping Corp. v. Seatrain Int'l S.A.*, 584 F.Supp. 734, 747 (E.D.N.Y.1984) (holding, in action alleging improper packing, that § 1304(3) "abolish[ed] any common law warranty" and required proof of shipper's "fault or neglect"; § 1304(6) not mentioned); *Poliskie Line Oceaniczne v. Hooker Chem. Corp.*, 499 F.Supp. 94, 101–02 (S.D.N.Y.1980) (finding shipper liable for improper stowage of hazardous chemical under theories of negligence and express warranty, but mentioning neither § 1304(3) nor § 1304(6)); *Di Gregorio v. N.V. Stoomvaart Maatschappij "Nederland,"* 411 F.Supp. 331, 334 (S.D.N.Y.1975) (holding that, where longshoreman was injured by collapsing crate, shipper's liability was "expressly limited" by § 1304(3); § 1304(6) not mentioned), *aff'd*, 531 F.2d 1143 (2d Cir.1976); *Serrano v. United States Lines Co.*, 238 F.Supp. 383, 388 (S.D.N.Y.1965) (holding that, where injury resulted from exploding tire aboard vessel, § 1304(3) "overrule[d]" any implied warranty of shipper that shipment was reasonably fit for carriage; § 1304(6) not mentioned).

**14.** Two of the three Law Lords who gave opinions in *Effort Shipping* concluded, after reviewing the American case law, that "there appear to be no United States cases in which the relationship between [§§ 1304(3) and 1304(6)] has fallen for decision." *Effort Shipping*, [1998] A.C. at 614 (Lord Lloyd of Berwick). Only Lord Steyn thought that "the established position in the United States" was that § 1304(3) (general negligence) qualifies § 1304(6) (dangerous-goods liability). *Id.* at 623. But Lord Steyn based his opinion entirely on commentary contained in a treatise, Michael Wilford et al., *Time Charters* (4th ed.1995), which offers only tentative conclusions: "It has been suggested that the liability to owners that may be imposed on shippers by the second part of Section 4(6) is reduced from an absolute obligation to an obligation of due diligence by Section 4(3) of the same Act.... The American cases ... suggest that the obligation is so reduced...." *Id.* at 169. The American cases cited by the authors, many of which are discussed in this opinion and its notes, are chiefly concerned with general maritime law and do not address the relationship between §§ 1304(3) and 1304(6). *See id.* at 173–76.

dangerous goods shipped without the carrier's knowledge of the danger

> [o]bviously ... cannot be dependent in any way on whether the shipper has knowledge of the dangerous nature of the goods. Yet the sentence continues, without a break, "and the shipper of such goods shall be liable." It is natural to read the two halves of the first sentence as being two sides of the same coin. If so, then the shippers' liability for shipping dangerous goods cannot be made to depend on the state of his knowledge. His liability is not confined to cases where he is at fault.

*Effort Shipping,* [1998] A.C. at 614; *see also id.* at 622 ("The natural construction is ... that in neither the first nor the second parts ... are the rights of owners conditional upon the actual or constructive knowledge, or due diligence, of shippers.") (Lord Steyn).

■ Lord Lloyd went on to supplement this plain-meaning, syntactical analysis with a comparison of Articles 4(3) and 4(6) that drew upon the canon of statutory interpretation known as *generalia specialibus non derogant*—general provisions do not qualify specific ones. To the shippers' argument that Article 4(6) is qualified by the negligence- or knowledge-based liability described in Article 4(3), Lord Lloyd replied, "The very breadth of [Article 4(3) ] ('shall not be responsible for loss or damage ... arising or resulting from any cause ...') makes it unlikely that it was intended to qualify the specific provisions of [Article 4(6) ]: *generalia specialibus non derogant." Effort Shipping,* [1998] A.C. at 614; *cf. Morales v. Trans World*

*Airlines, Inc.,* 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) ("[I]t is a commonplace of statutory construction that the specific [provision] governs the general."). We find the House of Lords' analysis in *Effort Shipping* to be generally persuasive and applicable to the corresponding U.S. COGSA provisions. The specific language and subject matter of COGSA § 1304(6) indicate that the latter provision is an exception to, rather than a special application of, the fault-based standard of·§ 1304(3).

Moreover, our conclusion that §§ 1304(3) and 1304(6) contemplate distinct ·kinds of liability ensures that the latter provision will not be rendered superfluous within the scheme of COGSA. *See Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute.") (internal quotation marks omitted); *Washington Market Co. v. Hoffman,* 101 U.S. 112, 115–16, 25 L.Ed. 782 (1879) ("As early as in Bacon's Abridgment, sect. 2, it was said that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' "). Inasmuch as § 1304(3) already provides for liability based on "the act, fault, or neglect of the shipper," § 1304(6) would appear to be carrying coals to Newcastle if its purpose were simply to specify that shipper liability in the dangerous-goods context requires knowledge on the shipper's part of the danger to which it is exposing the ship and other cargo.[15] In sum, the foregoing analysis of the plain meaning of § 1304(6) and its relationship to § 1304(3) strongly

---

15. We note that when COGSA legislators wished to specify a shipper *scienter* requirement regarding the nature of shipped goods, they had no difficulty doing so in clear terms: "Neither the carrier nor the ship shall be responsible in any event for loss or damage to or in connection with the transportation of the goods if the nature or value thereof has been knowingly and fraudulently misstated by the shipper in the bill of lading." 46 U.S.C.App. § 1304(5).

158

suggests that the two provisions have separate and distinct roles to play in COGSA's allocation of risk between shippers and carriers, and that § 1304(6) sets forth a rule of strict liability for a shipper of inherently dangerous goods when neither shipper nor carrier had actual or constructive preshipment knowledge of the cargo's dangerous nature. *Cf. Griffin*, 458 U.S. at 570, 102 S.Ct. 3245 ("Our task is to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive.") (internal quotation marks omitted).

█ The Shippers invoke a different rule of statutory construction: "[S]tatutes are legislated against a background of well established common law adjudicatory principles." Conceding that Britain's counterpart of COGSA § 1304(6), as construed by *Effort Shipping*, codifies the British maritime common-law rule that shippers *are* strictly liable for inherently dangerous goods,[16] the Shippers go on to contend that our § 1304(6) codifies the "well established rule under American law" that shippers of dangerous goods are *not* held strictly liable. The Shippers base their understanding of the pre 1936 American maritime common law of shipper liability almost entirely on one case: *The Wm. J. Quillan*, 180 F. 681 (2d Cir.1910). Before proceeding to discuss *Quillan* and other relevant case law, however, we must examine the legislative purpose and history of COGSA and the Hague Rules. We do so not because we find § 1304(6) to be ambiguous, but rather because this historical background will assist us in contextualizing § 1304(6) and in assessing the Shippers'

argument that the provision codified a specific rule of general maritime law in the United States.

## B. Legislative Purpose and History of COGSA and the Hague Rules

█ The legislative history of COGSA shows that the Act "was lifted almost bodily from the Hague Rules of 1921, as amended by the Brussels Convention of 1924, 51 Stat. 233." *Robert C. Herd & Co.*, 359 U.S. at 301, 79 S.Ct. 766. The purpose of the Hague Rules was "to establish uniform ocean bills of lading to govern the rights and liabilities of carriers and shippers *inter se* in international trade." *Id.* COGSA in its turn was designed to provide uniformity in the law governing carriage of goods by sea. "One important aspect of the international agreement and its United States counterpart is the standardization of liability expectations. In essence, the purpose of these laws is to allow international maritime actors to operate with greater efficiency and under a mantle of fairness." *Granite State Ins. Co. v. M/V Caraibe*, 825 F.Supp. 1113, 1123 (D.P.R. 1993) (citing Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* § 3–24, at 143–44 (2d ed.1975)). Given its overarching goal of international uniformity, COGSA could not deviate substantially from the Hague Rules. "There was no real dickering over the terms, no process of drafting and revision. The history of Congress's enactment of the COGSA therefore sheds fairly little light on its intent." *Servicios–Expoarma, C.A. v. Indus. Maritime Carriers, Inc.*, 135 F.3d 984, 990 (5th Cir.1998).[17] We note at the

**16.** Here, the Shippers part company with Judge Cedarbaum. *See M/V Tokyo Senator*, 2001 WL 238293, at \*4 (concluding that *Brass v. Maitland*, generally regarded as the leading British case on shipper liability in the dangerous-goods context, "did not impose an abso-

lute warranty"). We discuss below the bearing of *Brass* on the instant case.

**17.** This statement of the Fifth Circuit is correct in the sense that the resulting language of COGSA was in most material respects identi-

outset, therefore, that COGSA legislators appear to have been more intent on preserving the international consensus embodied in the language of the Hague Rules, and getting carriers and shippers to agree to that language, than on codifying particular rules of general maritime law as expressed in U.S. case law.

The historical evolution of COGSA reaches back into the nineteenth century and extends forward through various versions of the Hague Rules in the early 1920s and numerous House and Senate Bills in the 1920s and 1930s, before coming to rest in the statute as passed by Congress in 1936.[18] That history is remarkable for the extensive participation of shippers and carriers in discussing the

provisions that would eventually come to govern bills of lading under the laws of many nations. Throughout the various incarnations of what eventually became § 1304(6) of COGSA, while the language concerning carriers' rights to land or destroy dangerous goods underwent various alterations in form and emphasis, the language describing shippers' liability remained virtually unchanged. The phrase, "and the shipper of such goods shall be liable for all damages and expenses directly or indirectly arising out of or resulting from such shipment," underwent only one uneventful change from the first draft of the Hague Rules in 1921 through Congress's enactment of COGSA in 1936.[19]

cal to that of the Hague Rules. Nevertheless, the debate between the American shipper and carrier interests was intense at times and played a significant role in delaying Congressional passage of COGSA. *See generally* Michael F. Sturley, *The History of COGSA and the Hague Rules*, 22 J. Mar. L. & Com. 1 (1991).

18. We note that certain pre-Hague versions of language similar to that in § 1304(6) appeared in the Liverpool Conference Form ("Liverpool Form") and the Hamburg Rules of Affreightment ("Hamburg Rules"), promulgated by the International Law Association in 1882 and 1885, respectively. The Liverpool Form was a model bill of lading offered for voluntary adoption by agreement of shippers and carriers; the Hamburg Rules were model provisions that parties could voluntarily incorporate by reference into their bills of lading. These model documents made it explicitly clear that shippers who agreed to adopt them as or within bills of lading would be subject to strict liability for damages resulting from inherently dangerous goods. *See* Hamburg Rules (1885) ("Shipper accountable for any loss or damage to ship or cargo caused by inflammable, explosive, or dangerous goods, shipped without full disclosure of their nature, *whether such shipper shall have been aware of it or not*, and whether such shipper be principal or agent: such goods may be thrown overboard or destroyed by the master or owner of the ship at any time without

compensation."), *reprinted in* 2 Michael F. Sturley, *The Legislative History of the Carriage of Goods by Sea Act and the Travaux Préparatoires of the Hague Rules* 116, 123 (1990) (emphasis added); Liverpool Form (1882) (same), *reprinted in id.* at 62. Neither the Hague Rules nor COGSA incorporated the phrase "whether such shipper shall have been aware of it or not" in their corresponding provisions for dangerous-goods liability, and the recorded history of the Hague Rules and COGSA sheds no light on why the phrase was not included.

19. The historical derivation of this phrase has been fully documented. Only one small change was ever introduced into the phrase, in a draft of the Hague Rules, as indicated below by italics: Hague Rules (1921 International Law Association draft) ("... and the shipper of such goods shall be liable for all damages directly or indirectly arising out of or resulting from such shipment"); Hague Rules of 1921 ("... and the shipper of such goods shall be liable for all damages *and expenses* directly or indirectly arising out of or resulting from such shipment"); Hague Rules (Comité Maritime International draft) (same); Hague Rules of 1922 (same). The phrase, in the form adopted in the Hague Rules of 1921, remained unchanged through every bill introduced in Congress: H.R. 14166, 67th Cong., 4th Sess. (Feb. 2, 1923); H.R. 5080, 68th Cong., 1st Sess. (Jan. 9, 1924); S. 3177, 68th Cong., 1st Sess. (Apr. 25, 1924); H.R. 114447,

During the decades of debate over the language of the Hague Rules and COGSA, almost no comment was directed at the language of shipper liability in what eventually became § 1304(6). *Cf. Effort Shipping,* [1998] A.C. at 623–24 ("The resort to the travaux préparatoires [of the Hagues Rules] provided nothing worthy of consideration in the process of the interpretation of article IV, r. 3 and article IV, r. 6.") (Lord Steyn). Instead, discussants focused on the carrier's knowledge of dangerous goods or the problem of adequate notice to the carrier of a cargo's dangerous nature.[20] We have discovered only one recorded instance of a challenge to the language of shipper liability in what eventually became § 1304(6). Among the statements presented by various nations at the 1923 International Conference on Maritime Law in Brussels, the Norwegian government suggested that the provisions that would later become §§ 1304(3) and 1304(6) of COGSA should be deleted entirely "because the real purpose of the convention was to regulate the obligations of the carrier" and the provisions for shipper liability "followed general legal principles."[21] Clearly, Norway was raising the question of whether such shipper liability need be addressed at all in the carriage provisions, not whether that liability should be strict or fault-based.

There is equally little discussion of COGSA's language of shipper liability for dangerous goods in the more than ten years of Congressional deliberations over the various bills that eventually became COGSA. Although the shippers' lobby was vocal, the legislative history does not show that shippers commented on the nature of the liability contemplated under § 1304(6).[22] In one exchange during House hearings, a representative of the American Institute of Marine Underwriters appeared to take it as given that a shipper would be "naturally responsible" where its goods were "explosive" or "of such a nature that they cause damage to other goods."[23] In any event, one point of

68th Cong., 2d Sess. (Jan. 8, 1925); H.R. 12339, 68th Cong., 2d Sess. (Feb. 18, 1925); S. 1295, 70th Cong., 1st Sess. (Dec. 9, 1927); H.R. 12208, 70th Cong., 1st Sess. (Mar. 19, 1928); S. 3838, 70th Cong., 1st Sess. (Mar. 22, 1928); H.R. 3830, 71st Cong., 1st Sess. (June 10, 1929); S. 482, 72d Cong., 1st Sess. (Dec. 9, 1931); S. 2598, 73d Cong., 2d Sess. (Feb. 2, 1934); S. 1152, 74th Cong., 1st Sess. (Jan. 17, 1935) (enacted as amended, Apr. 16, 1936). The textual evolution of COGSA is fully traced in 1 Sturley, *supra,* at 25–86.

20. *See, e.g.,* Second Day's Proceedings of the Maritime Law Committee of the International Law Association, The Peace Palace, The Hague (Aug. 31, 1921), *reprinted in* 1 Sturley, *supra,* at 179, 272–73 (discussing the manner of notice to be given by shipper to carrier regarding the nature and character of goods); Third Session of the International Conference on Maritime Law, Brussels (Oct. 21, 1922), *reprinted in id.* at 401, 402–03 (discussing questions raised by the Swedish delegate concerning the discretion of carriers to unload or throw overboard dangerous goods).

21. Observations of Norway, International Conference on Maritime Law, Meeting of the Sous Commission, Brussels (Oct. 6–9, 1923), *reprinted in* 1 Sturley, *supra,* at 419, 420–21.

22. In 1926, for example, a "large number of representative American shippers" addressed a memorandum to the Secretary of State in which they objected to the U.S. government's then-contemplated ratification by treaty of what later became COGSA. The memorandum expressed various concerns over § 1304(6)—pointing out, for example, the fact that goods could be inflammable without being dangerously so—but did not raise the specific issue of strict liability for unknown, inherent dangers of goods. *Int'l Convention for the Unification of Certain Rules in Regard to Bills of Lading for the Carriage of Goods by Sea: Hearing Before a Subcomm. of the Sen. Comm. on Foreign Relations,* 70th Cong., 1st Sess. 32, 39 (1927), *reprinted in* 3 Sturley, *supra,* at 356, 363.

23. *Uniform Ocean Bills of Lading: Hearings Before the House Comm. on Merchant Marine*

consensus that emerges unambiguously from the legislative history of COGSA is that, as a cotton exporter put it in a letter printed in a House Report, "the purpose of this [bill] is to establish international uniformity of ocean bills of lading on a basis fair to ocean carriers, cargo owners, insurers, and bankers. As far as we know, no one is opposing this bill." [24] Again and again, Congress stressed that "[t]his bill ... is an important step in a world-wide movement for uniformity in ocean bills of lading." [25]

In sum, the history of COGSA and the Hague Rules tells us little about the kind of liability that legislators and drafters thought they were adopting in § 1304(6) and its earlier versions.[26] Legislative silence can be made to tell many stories, of course, and we decline to force any specific conclusions from such a record. On the whole, however, it appears to us that Congress was chiefly concerned with preserving intact the hard-won international consensus reflected in the language of the Hague Rules, and securing the agreement of American shipper and carrier interests to that language. We would be surprised to learn that these legislators simultaneously sought to square each COGSA provision with particular features of gener-

al maritime law in the United States. The Shippers in the instant case imply that the absence of debate concerning dangerous-goods liability shows that something as drastic as strict liability for shippers was never contemplated by COGSA legislators. But if, as the Shippers contend, § 1304(6) simply codified a "well settled" and "established" American maritime rule that shippers could not be held strictly liable, then this Court must find that such a rule was in fact established and settled in American maritime common law prior to 1936. As indicated below, we do not find such a firmly established rule.

### C. The Wm. J. Quillan

In drawing conclusions regarding general maritime common law, the district court in the instant case observed that in the 1910 case of *The Wm. J. Quillan,* the Second Circuit "rejected the absolute warranty theory [for shippers of inherently dangerous cargo]." *M/V Tokyo Senator,* 2001 WL 238293, at *4. The Shippers argue that *Quillan*'s holding "represented (and continues to represent) the federal maritime common law in the United States." Clearly, much of the Shippers' case rests upon this contention and the companion assertion that Congress codi-

---

*and Fisheries,* 74th Cong., 2d Sess. 51 (1936), *reprinted in* 3 Sturley, *supra,* at 595, 649. After stating that shippers are "naturally responsible" for damages resulting from "explosive" or dangerous cargo, the underwriters' representative was asked by the committee chairman, "If he does not disclose the nature of the goods?" The representative replied, "Yes," but because disclosure of the "nature" of goods might be satisfied by a simple description of the cargo, the representative did not indicate whether or not the shipper's responsibility in this context required its knowledge and disclosure of the inherently dangerous nature of the cargo. *Id.*

**24.** H.R.Rep. No. 2218, 74th Cong., 2d Sess. 3 (1936).

**25.** S.Rep. No. 742, 74th Cong., 1st Sess. 4 (1935).

**26.** Lord Steyn in *Effort Shipping* observed that "at the time of the drafting of the Hague Rules the dominant theory in a very large part of the world was that shippers were under an absolute liability not to ship dangerous goods. This circumstance must have been known to those who drafted and approved the Hague Rules." *Effort Shipping,* [1998] A.C. at 625. Lord Steyn's observation is based in part on his conclusion that the general maritime rule of dangerous-goods liability was the same in Britain and the United States prior to adoption of the Hague Rules.

fied the fault- or knowledge-based rule of *Quillan* when it enacted COGSA.[27]

The facts of *Quillan* are straightforward. In 1905, a cargo owner chartered the schooner William J. Quillan to carry a cargo of tankage (a dry powder derived from processed street garbage) from Barren Island, New York, to Savannah, Georgia. Tankage, observed the *Quillan* Court, "has been the subject of transportation for 25 or 30 years, and shippers and shipowners must be taken to have knowledge of its character." *Quillan*, 180 F. at 681. One day into the voyage, the cargo was discovered to be on fire. The schooner put into Norfolk for refuge, and city fire engines poured water into the hold, in the process damaging a large quantity of tankage that had escaped the flames unscathed. The cargo owner's insurer filed a libel against the vessel, alleging that the schooner owed the insurer a substantial sum in reimbursement or as contribution in general average. *The Wm. J. Quillan*, 175 F. 207, 208 (S.D.N.Y.1910). The schooner defended itself by arguing that the tankage cargo was in an improper condition through the neglect and fault of the shipper. *Id.* at 209–10.

The district court, applying the rule of strict liability for shippers of inherently dangerous goods as set forth in *Pierce v. Winsor*, 19 F. Cas. 646 (C.C.D.Mass.1861) (No. 11,151) (Clifford, Circuit Justice), dismissed the libel on the ground that the shipper must be held responsible for shipping dangerous cargo, "although neither he nor the carrier knew of its dangerous condition." *Quillan*, 180 F. at 682. The Second Circuit reversed, holding that a shipper could not be deemed to give an absolute warranty for the fitness of cargo. *Id.* at 684–85. In the process, the *Quillan* Court expressly disagreed with the strict-liability holding of *Pierce* and conformed its own holding to what it took to be the British maritime common-law rule respecting shipper liability, which the Court interpreted as requiring knowledge or fault on the part of the shipper. *Id.* at 683–84.

It is far from certain that *Quillan* exclusively represented general maritime law in 1936. In *Pierce*, decided in 1861, U.S. Supreme Court Justice Clifford, sitting on circuit, had adopted a rule of strict liability for shippers of inherently dangerous goods, and *Pierce* was still persuasive fifty years later when the district court in *Quillan* relied on it almost exclusively. *See Quillan*, 175 F. at 211 ("I find nothing in the law of general average which would take this case out of the principles expressed in *Pierce v. Winsor* ....."). *Pierce* involved a chartered voyage from Boston to San Francisco[28] during which a new article called mastic—bituminous matter formed into cakes—melted and stuck to the vessel and other cargo. Concluding that neither the carrier nor the shipper had had prior knowledge of mastic's dan-

---

27. We note in passing that *Quillan* addressed concerns that fall outside the scope of COGSA. First, COGSA governs bills of lading, not charter parties (private contracts of carriage) like the one in *Quillan*. 46 U.S.C. § 1305 ("The provisions of this chapter shall not be applicable to charter parties...."). Second, the schooner Wm. J. Quillan set out from Barren Island, New York, and was bound for Savannah, Georgia. COGSA applies exclusively to "the carriage of goods by sea to or from ports of the United States, *in foreign trade.*" *Id.* § 1300 (emphasis added); *see also id.* § 1312 ("The term 'foreign trade' means

the transportation of goods between the ports of the United States and ports of foreign countries. Nothing in this chapter shall be held to apply to contracts for carriage of goods by sea between any port of the United States or its possessions, and any other port of the United States or its possessions....").

28. Inasmuch as *Pierce* involved a coast-to-coast voyage governed by a charter party, *Pierce*, like *Quillan*, would not have fallen within the scope of COGSA.

gerous nature, Justice Clifford ruled that the shipper should be held strictly liable, because it was "more just and expedient" that the party better able to discover the danger should be the one to suffer. *Pierce*, 19 F. Cas. at 651. In reaching this conclusion, Justice Clifford relied heavily on the English case of *Brass v. Maitland*, [1856] 6 El. & Bl. 470 (Q.B.1856), which, until the House of Lords' recent decision in *Effort Shipping*, was generally regarded as the leading case on maritime common-law strict liability for shippers.[29]

The *Quillan* Court explicitly disagreed with *Pierce*'s rule of strict liability for shippers, largely because the *Quillan* panel, which also sought to conform American maritime common law to its British counterpart, concluded that *Brass v. Maitland* did not set forth a general rule of strict liability for shippers of inherently dangerous goods. Relying on the then-recent British case of *Greenshields v. Stephens*, [1908] 1 K.B. 51 (C.A.1907),[30] the *Quillan* Court observed that the majority opinion in *Brass* "does not show that the defendants [in that case] would have been held liable if they had not known that the contents of the casks were dangerous." *Quillan*, 180 F. at 684. Yet, despite the *Quillan* Court's apparent effort to distinguish the packing of the casks in *Brass* from their dangerous contents, the *Brass* majority stated a broad principle when, over the dissent of Crompton, J., it rejected the defendant shipper's plea of ignorance concerning the dangerous nature of the cargo and its packing:

> [T]he ignorance of the [shippers], and those employed by them, can be no ex-

**29.** *See* Tetley, *supra*, at 463–64 ("In the common law, the leading case is *Brass v. Maitland*, where the majority held that the [shipper's] warranty was absolute, while Crompton J. in the minority held that it was qualified."). Tetley suggests that in the United States, *Pierce* adopted the *Brass* majority view, while *Quillan* adopted the minority view. We note that Tetley's analysis of the general maritime law in the United States does seem to accord with that of the Shippers. *See id.* at 464 ("In the United States, under the general maritime law, the shipper's warranty was originally considered absolute, but is now viewed as qualified and therefore the shipper is only held to his actual or constructive knowledge."); *cf.* 2A *Benedict on Admiralty* § 99, at 9–14 (2000) ("Prior to the enactment of the Carriage of Goods by Sea Act, it was held that while the shipowner impliedly warrants that his ship is fit for the voyage, and will not injure the cargo, there was no corresponding warranty on the part of the cargo owner that his goods will not injure or delay the ship.") (citing, *inter alia, Quillan*, 180 F. 681); *see also Aktieselskabet Fido v. Lloyd Brazileiro*, 267 F. 733, 736–37 (S.D.N.Y.1919) ("It is the law of this court that charterers are not liable for concealed defects in the cargo or subject to any implied warranty of its fitness for shipment.") (citing *Quillan*, 180 F. 681), *aff'd on other grounds*, 283 F. 62 (2d Cir.1922).

**30.** *Greenshields* does appear to have taken a view of *Brass* similar to that in *Quillan*. *Greenshields*, however, involved a shipment of coal that spontaneously ignited at sea. In holding that the coal shippers could claim contribution in general average, one member of the *Greenshields* court stated that under *Brass* and especially its dissenting opinion, "[t]here is no absolute warranty by the shipper of safety in cases where the goods shipped may be openly seen and *are known by the shipowner to be by their nature possibly productive of danger." Greenshields*, [1908] 1 K.B. at 61–62 (Kennedy, L.J.) (emphasis added). Lord Justice Kennedy went on to stress that the coal shippers "merely shipped that which the shipowner *knew he was taking on board with its liability to spontaneous combustion." Id.* (emphasis added). Thus, the discussion of shipper liability in *Greenshields* was shaped by the assumption that the dangers of coal were well known to the carrier in that case, as the district court in *Quillan* pointed out. *See Quillan*, 175 F. at 211 ("[*Greenshields* ] covered coal, which the ship owner knew was liable to spontaneous combustion. . . ."). In contrast, *Pierce* involved a new article (mastic) whose hazardous propensities, like those of the TDO in the instant case, were unknown.

cuse for putting on board without notice the dangerous goods insufficiently packed.... The [shippers], and not the [carrier], must suffer, if from the ignorance of the [shippers] a notice was not given to the [carrier], which the [carrier was] entitled to receive, and from the want of this notice a loss has arisen which must fall either on the [carrier] or on the [shippers].

*Brass,* [1856] 6 El. & Bl. at 486. In light of this language, *Brass* has come to be generally regarded as establishing a rule of strict liability for shippers of dangerous goods.

The House of Lords in *Effort Shipping* reaffirmed this interpretation of *Brass* when they unanimously concluded that both *Brass* and the British counterpart of our COGSA § 1304(6) impose strict liability on a shipper of dangerous goods where the carrier did not give informed consent to the shipment, whether or not the shipper knew of the danger. *Effort Shipping,* [1998] A.C. at 619 (Lord Lloyd); *see also The "Athanasia Comninos,"* [1990] 1 Lloyd's Rep. 277, 282 (Q.B.1979) ("My own view is that the weight of authority supports the absolute character of the warranty [found by the *Brass* majority]."). The

decision of the Law Lords suggests that Justice Clifford in *Pierce* correctly interpreted the strict-liability holding of *Brass.*[31]

*Pierce* is a decision that must be reckoned with in any attempt to determine what COGSA legislators thought about shipper liability at American maritime common law. The Shippers in the present case miscite the *Pierce* court as "D. Mass," when, in fact, *Pierce* was an appeal from a judgment of the district court of Massachusetts to one of the old circuit courts that had federal appellate jurisdiction of certain cases, including appeals in admiralty. *See* Richard H. Fallon et al., *Hart & Wechsler's The Federal Courts and the Federal System* 28–29 (4th ed.1996). It was not until 1891 that the Circuit Court of Appeals Act transferred the circuit courts' appellate authority to the newly-created circuit courts of appeals. *Id.* at 37 & n. 66. Therefore, the divergence between *Pierce* and *Quillan* may have constituted, in 1936, something akin to a circuit split over the liability of shippers of dangerous goods.[32] Consequently, we are unconvinced that attentive COGSA legislators would have ignored this divergence or would simply

---

31. Like the Second Circuit in *Quillan,* the district court in the instant case seems to have believed that it was conforming American maritime common law to its British counterpart. *See M/V Tokyo Senator,* 2001 WL 238293, at \*4 ("*Brass* [*v. Maitland* ] itself did not impose an absolute warranty."). The district court's failure to mention *Effort Shipping,* however, undermines this attempt.

32. A latecomer to the judicial debate over dangerous-goods liability for shippers under general maritime law was *Ionmar Compania Naviera, S.A. v. Olin Corp.,* 666 F.2d 897 (5th Cir.1982), which held that a chemical manufacturer-shipper "had a duty to warn [the stevedore and carrier] of the foreseeable hazards inherent in the HTH shipment of which the stevedore and the ship's master could not reasonably have been expected to be aware,"

and that "[c]onversely, [the manufacturer-shipper] had no duty to warn [the stevedore and carrier] of hazards of which they were aware or could reasonably have been expected to be aware." *Id.* at 904. *Ionmar* thus seems to line up with *Quillan,* but the opinion makes no mention of *Quillan, Pierce,* or *Brass.* The parties' claims sounded entirely in negligence, and the court makes scant reference to COGSA and none at all to § 1304(6). Moreover, the chemical at issue, HTH, was a known fire hazard that had been subject to substantial regulation. *Id.* at 899. Like the decision in *Greenshields,* therefore, the Fifth Circuit's analysis in *Ionmar* turned on what the parties knew—an issue more appropriate for a negligence than for a strict-liability standard.

have chosen, without comment, the *Quillan* position over the rule in *Pierce*.

Moreover, *Quillan* was not the only pre 1936 Second Circuit decision to weigh in on the strict-liability rule of *Pierce* and *Brass*. In *The Santa Clara*, 281 F. 725 (2d Cir.1922), this Court held that where a charterer misleads a carrier as to the nature of cargo, with the result that the cargo is improperly loaded, "the damages resulting from the improper loading should fall upon the charterer, and not upon the shipowner." *Id.* at 736. Although this case did not involve strict liability for shippers of inherently dangerous goods, the *Santa Clara* panel, in contrast to the *Quillan* panel, cited amply and approvingly the strict-liability holdings of *Pierce* and *Brass* to support its policy conclusion that, as between a charterer possessed of knowledge that would ensure the safety of cargo and a shipowner lacking such knowledge, it is "fair and proper" that any loss should fall upon the former. *Id.* "The conclusion reached," said the Court, "seems, under the circumstances, as just and expedient as that reached in *Brass v. Maitland.*" *Id.* Thus, *The Santa Clara*, a case decided ten years after *Quillan*, suggests that the Second Circuit's views concerning the leading shipper-liability cases in the dangerous-goods context were less settled and established than the Shippers here suggest.[33]

## D. COGSA § 1304(6) Did Not Codify Preexisting General Maritime Law Regarding Liability for Shippers of Dangerous Goods.

For the foregoing reasons, we are not persuaded that COGSA legislators would have found the federal maritime common law of shipper liability sufficiently coherent or settled for purposes of codification. In *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings*, 268 F.3d 103 (2d Cir.2001), this Court noted that "where a common-law principle is well established . . . the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident." *Id.* at 127 (internal quotation marks omitted); *see also Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783, 72 S.Ct. 1011, 96 L.Ed. 1294 (1952) ("Statutes which invade the common law or the general maritime law are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident."); *In re Oswego Barge Corp.*, 664 F.2d 327, 335 (2d Cir.1981)

---

**33.** A comparison of the citation histories of *Pierce* and *Quillan* suggests that American maritime common law has never fully settled the nature of a shipper's dangerous-goods liability. Cases citing *Quillan* for the proposition that, under general maritime law, shippers have a duty to warn only of inherent dangers of which they have actual or constructive knowledge include: *Borgships*, 1997 WL 124127, at *3; *Narcissus Shipping Corp. v. Armada Reefers, Ltd.*, 950 F.Supp. 1129, 1143 (M.D.Fla.1997); *Sucrest Corp.*, 455 F.Supp. at 384; *Aktieselskabet Fido*, 267 F. at 736–37. Cases citing *Pierce* (either the trial court or the circuit court opinion) for its rule that a shipper gives an implied warranty that goods are safe for shipment include: *The Santa Clara*, 281 F. at 736; *Atkins, Kroll & Co. v.*

*Nedlloyd Line*, 210 F.Supp. 315, 317 (N.D.Cal. 1962) (distinguishing *Pierce* as not applicable to a consignee); *Luckenbach Steamship Co. v. Coast Mfg. & Supply Co.*, 185 F.Supp. 910, 919 & n. 25 (E.D.N.Y.1960); *Westchester Fire Ins. Co. v. Buffalo Housewrecking & Salvage Co.*, 40 F.Supp. 378, 381–82 (W.D.N.Y.1941) (distinguishing *Pierce* on the ground that the dangerous propensities of the cargo in *Westchester Fire* were not unknown at the time), *aff'd*, 129 F.2d 319 (2d Cir.1942); *The Wm. J. Quillan*, 175 F. 207, 211 (S.D.N.Y.), *rev'd*, 180 F. 681 (2d Cir.1910); *Hanna v. Pitt & Scott*, 121 A.D. 420, 106 N.Y.S. 145, 146–47 (2d Dep't 1907) (distinguishing *Pierce* on the basis of the carrier's knowledge). Several of the cases that cite *Pierce* also cite *Brass v. Maitland* in the same context.

(stating that one factor in assessing a statute's preemptive effect on general maritime law is whether the judge-made law at issue represents a " 'long-established and familiar principle[ ]' of the 'common law or the general maritime law' ") (quoting *Isbrandtsen*, 343 U.S. at 783).

In *Attorney General of Canada*, this Court held that the "revenue rule," which provides that courts of one sovereign will not enforce final tax judgments or unadjudicated tax claims of other sovereigns, had not been abrogated by the enactment in 1970 of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* Unlike the shipper liability rule set forth in *Quillan*, however, the revenue rule, which also had its origins in early English court decisions, is a "time-honored common law prudential rule" whose continuing vitality was amply acknowledged ·by the U.S. Supreme Court and numerous other courts and commentators in the years before enactment of RICO. *Attorney Gen. of Canada*, 268 F.3d at 129. Moreover, in contrast to the *Quillan* rule, it is clear that Congress "was and is aware of the revenue rule." *Id.* at 130.

To sum up, we conclude that the nature of a shipper's dangerous-goods liability under general maritime law in the United States was not firmly settled in 1936. The rule of *The Wm. J. Quillan* diverged diametrically from that of *Pierce v. Winsor;* and whereas this Court in *Quillan* disagreed with *Pierce*'s holding and interpreted *Brass v. Maitland* to require shipper *scienter* in the dangerous-goods context, the Court twelve years later in *The Santa Clara* cited *Pierce* and *Brass* approvingly for the policy behind their strict-liability holdings. This state of affairs cannot remotely be likened to the "time-honored" common-law rule described in *Attorney General of Canada* or the "long-established and familiar principles" referred to

in *Isbrandtsen.* We hold that in enacting § 1304(6), Congress did not codify a general maritime rule requiring proof of a shipper's knowledge of the inherent danger of shipped goods before liability could be imposed on the shipper for damages resulting directly or indirectly from such shipment.

**E. COGSA § 1304(6) Supersedes Otherwise Inconsistent General Maritime Law Regarding Liability for Shippers of Dangerous Goods.**

■ Having concluded that COGSA § 1304(6) did not codify preexisting maritime common law regarding liability for shippers of inherently dangerous goods, we turn to the related question of whether § 1304(6) would displace otherwise inconsistent maritime common law. We hold that it does. The Supreme Court has stated that where the issue is whether federal statutory or federal common law governs, "we start with the assumption that it is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law." *City of Milwaukee v. Illinois*, 451 U.S. 304, 317, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) (internal quotation marks omitted); *see also id.* at 314, 101 S.Ct. 1784 (noting that federal common law is a "necessary expedient" and that "when Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears"). ·"While federalism concerns create a presumption against preemption of state law, including state common law, separation of powers concerns create a presumption in favor of preemption of federal common law whenever it can be said that Congress has legislated on the subject." *Oswego Barge*, 664 F.2d at 335 (internal citations omitted); *see also Cummings v. Miller Time*, 705 F.Supp. 62, 64 (D.P.R.1988) ("In contrast with the

stricter federal preemption standard, 'evidence of a clear and manifest purpose is not required' to show that Congress intended to supersede, foreclose, or supplant federal common law.") (quoting *City of Milwaukee*, 451 U.S. at 317, 101 S.Ct. 1784).

■■■■■ Because the federal judiciary traditionally has had a more expansive role to play in the development of maritime law than in the development of non-maritime federal common law, *see Northwest Airlines, Inc. v. Transport Workers Union*, 451 U.S. 77, 95–96, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981), the Second Circuit has recognized that the presumption of statutory preemption applies "somewhat less forcefully to judge-made maritime law," *Oswego Barge*, 664 F.2d at 336. "Even in admiralty, however, where the federal judiciary's lawmaking power may well be at its strongest, it is our duty to respect the will of Congress." *Northwest Airlines*, 451 U.S. at 96, 101 S.Ct. 1571. The Second Circuit has looked to several factors in determining whether the presumption in favor of statutory displacement of general maritime law has been overcome: (1) whether statutory language explicitly preserves or preempts judge-made law, or whether evidence of Congressional intent to achieve such results may be found in the legislative history; (2) the scope of the legislation; (3) whether applying judge-made law "would entail 'filling a gap left

by Congress' silence' or 'rewriting rules that Congress has affirmatively and specifically enacted,'" *Oswego Barge*, 664 F.2d at 339 (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978)); and finally (4) whether the judge-made law at issue represents a "'long-established and familiar principle[ ]' of the 'common law or the general maritime law,'" *id.* (quoting *Isbrandtsen*, 343 U.S. at 783, 72 S.Ct. 1011).

With respect to the first factor, COGSA and its legislative history, as noted above, offer no discussion of the relationship between § 1304(6) and preexisting maritime common law. Where COGSA does exclude or qualify the reach of its provisions, its intention to do so is made expressly clear in the statute.[34] As to the second factor, by setting forth in detail the rights, duties, liabilities, and immunities of carriers, COGSA extensively governs the relations of carriers and shippers with respect to "all contracts of carriage of goods by sea to or from ports of the United States in foreign trade." 46 U.S.C.App. § 1312; *cf. Sea–Land Serv., Inc. v. J & W Import/Export, Inc.*, 976 F.Supp. 327, 330 (D.N.J. 1997) ("COGSA extensively governs the responsibilities, liabilities, rights, and immunities of parties who enter into contracts for the carriage of goods by sea."); Sturley, *The Fair Opportunity Requirement Under COGSA Section 4(5), supra*, at 2 ("[COGSA] is the central statute in

---

**34.** *See, e.g.,* 46 U.S.C.App. § 1308 ("The provisions of this chapter shall not affect the rights and obligations of the carrier under the provisions of the Shipping Act, 1916, or under the provisions of sections 175, 181 to 183, and 183b to 188 of this title or of any amendments thereto; or under the provisions of any other enactment for the time being in force relating to the limitation of the liability of the owners of seagoing vessels."); *id.* § 1311 ("Nothing in this chapter shall be construed as superseding any part of sections 190 to 196 of this title, or of any other law which would

be applicable in the absence of this chapter, insofar as they relate to the duties, responsibilities, and liabilities of the ship or carrier prior to the time when the goods are loaded on or after the time they are discharged from the ship."); *id.* § 1313 (providing that during any period in which §§ 1301 to 1308 have been suspended by Presidential proclamation, any contract for carriage of goods by sea that would otherwise be subject to COGSA "shall be subject to all provisions of law now or hereafter applicable to that part of said sections ... suspended").

commercial admiralty, governing over $200 billion worth of American foreign commerce annually.").

■ We must therefore ask whether the legislative scheme of COGSA speaks directly to the question of strict liability for shippers of inherently dangerous goods. "[W]hen [a maritime code] does speak directly to a question, the courts are not free to 'supplement' Congress' answer so thoroughly that the Act becomes meaningless." *Higginbotham,* 436 U.S. at 625, 98 S.Ct. 2010. "There is a basic difference," observed the Supreme Court in *Higginbotham,* "between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted." *Id.; see also Public Adm'r v. Angela Compania Naviera, S.A.,* 592 F.2d 58, 63 (2d Cir.1979) ("The *Higginbotham* Court made it clear that, where Congress has made a judgment regarding the shape of wrongful death recoveries, the courts are not free to substitute their own judgments.").[35]

■ Because we have determined that § 1304(6), by its plain meaning, does not imply a shipper *scienter* requirement, we conclude that the provision does speak directly to the question of whether a shipper of inherently dangerous goods may be held liable for damages resulting directly or indirectly from such shipment when neither the shipper nor the carrier had actual or constructive preshipment knowledge of the danger. We hold that § 1304(6) answers that question in the affirmative. It follows that *Quillan* and other pre 1936 decisions that set forth a rule of general maritime law that is inconsistent with § 1304(6) have been superseded by that provision,[36] and that post 1936 decisions, such as *Borgships,* that construe § 1304(6) as incorporating such an inconsistent common-law rule are incorrect.[37] To hold that the rule of *Quillan* governs the facts of the present case would be "to 'supplement' Congress' answer so thoroughly that [§ 1304(6)] becomes meaningless." *Higginbotham,* 436 U.S. at 625, 98 S.Ct. 2010; *cf. Miller Export Corp. v. Hellenic Lines, Ltd.,* 534 F.Supp. 707, 710 (S.D.N.Y. 1982) ("[T]his Court has held that the exclusive application of COGSA cannot be avoided by couching claims in terms of negligence or other common law causes of action."); *see also Effort Shipping,* [1998] A.C. at 622 ("[P]ro tanto the Hague Rules upon their enactment displaced the common law.") (Lord Steyn).

---

**35.** In *Higginbotham,* the Supreme Court held that the Death on the High Seas Act ("DOHSA") governs wrongful-death recoveries on the high seas, and refused to provide damages for "loss of society" under the general maritime law when Congress had not provided for such damages in DOHSA. *Higginbotham,* 436 U.S. at 624–25, 98 S.Ct. 2010.

**36.** Our conclusion is supported by a leading American treatise on admiralty law, which states unreservedly that, in the circumstances covered by § 1304(6), "the shipper is liable for all damages and expenses." 2A *Benedict on Admiralty* § 99, at 9–14 (2000). *Benedict* goes on to note: "Prior to the enactment of the Carriage of Goods by Sea Act, it was held that while the shipowner impliedly warrants that his ship is fit for the voyage, and will not injure the cargo, there was no corresponding warranty on the part of the cargo owner that his goods will not injure or delay the ship." *Id.* (citing, *inter alia, Quillan,* 180 F. 681). *Benedict* thus suggests that Congress's enactment of § 1304(6) superseded a "prior" common-law rule of non-strict liability for shippers of dangerous goods, replacing it with a rule of strict liability. As noted above, however, we cannot agree with *Benedict*'s implication that in the pre-COGSA period, general maritime law in the United States reflected a settled rule of liability for shippers of inherently dangerous goods.

**37.** Our holding does not affect the potential applicability of *Quillan, Borgships,* and related cases to facts not falling within the scope of COGSA.

In determining that § 1304(6)'s strict-liability rule displaces otherwise inconsistent general maritime law, we have been mindful of COGSA's overarching purpose to "allocat[e] risk of loss and creat[e] predictable liability rules on which not only carriers but others can rely." *Stolt Tank Containers v. Evergreen Marine Corp.*, 962 F.2d 276, 279 (2d Cir.1992). The recognition that, in the rare circumstances of a case such as this, the strict-liability rule of § 1304(6) supersedes the varying and uncertain rule of maritime common law will help ensure predictability in the allocation of risk between maritime parties. Moreover, just as eighty years ago we observed that the policy-based rule of *Pierce v. Winsor* and *Brass v. Maitland* was "just and expedient," *The Santa Clara*, 281 F. at 736, we conclude today that a strict-liability construction of § 1304(6) will foster fairness and efficiency

in the dealings of commercial maritime actors.[38] In contrast to a carrier, which typically is in the position of taking aboard its vessel a large quantity and variety of cargoes, a shipper can be expected to have greater access to and familiarity with goods and their manufacturers before those goods are placed in maritime commerce. If an unwitting party must suffer, it should be the one that is in a better position to ascertain ahead of time the dangerous nature of shipped goods. That party in many cases will be the shipper.[39]

We note, furthermore, that in conforming our construction of COGSA § 1304(6) to that given to its British counterpart by the House of Lords in *Effort Shipping*, we are furthering another broad purpose of COGSA and the Hague Rules: international uniformity in the law of carriage of goods by sea. One point on which pre 1936 Second Circuit cases agreed unani-

---

**38.** In supplementary appellate briefs, the parties in the instant case did not identify any significant expectations in the maritime or insurance industry that would be unsettled by our interpreting 46 U.S.C.App. § 1304(6) to impose strict liability on the shipper in the rare event that neither party had actual or constructive knowledge of a cargo's inherent danger. First, insofar as the parties indicated that shippers' marine insurance policies as now commonly written exclude coverage for damage caused by hazardous materials, we note that imposing strict shipper liability under § 1304(6) should not alter insurance as shippers currently know it, but instead will establish a clear allocation of risk that should assist maritime actors and insurers in preparing for the marginal possibility of an unknown cargo hazard. The Shippers did not show, moreover, that additional insurance coverage for unknown inherent dangers is unavailable or prohibitively priced. Second, to the extent that federal laws; as the Shippers point out, already regulate transportation of known hazardous and dangerous materials, and impose civil and criminal penalties for knowing violations of these laws, our interpretation of § 1304(6) should not render shipper liability incoherent and uncer-

tain, but instead will fill a gap with respect to materials whose inherent hazards are unknown to federal regulators.

**39.** COGSA contains a number of carrier defenses predicated on the carrier's limited ability to know the character of the cargo it agrees to ship. One of these is the provision that "[n]either the carrier nor the ship shall be responsible for loss or damage arising or resulting from ... inherent defect, quality, or vice of the goods." 46 U.S.C.App. § 1304(2)(m); *see also Raphaely Int'l, Inc. v. Waterman S.S. Corp.*, 972 F.2d 498, 504 (2d Cir.1992) ("An inherent vice is defined as any existing defects, diseases, decay or the inherent nature of the commodity which will cause it to deteriorate with a lapse of time.") (internal quotation marks omitted). "The theory and policy of the [§ 1304(2)(m)] exemption," according to one noted commentator, "is that the shipper rather than the carrier should know the inherent characteristics of the goods shipped and should have the responsibility of guarding against it." 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 10–30, at 144 (3d ed.2001). We find that a similar rationale underlies the allocation of risk in 46 U.S.C.App. § 1304(6).

mously was that "in matters of commercial law our decisions should conform to the English decisions, in the absence of some rule of public policy which would forbid." *The Turret Crown,* 297 F. 766, 776–77 (2d Cir.1924); *see also Lehigh & Wilkes–Barre Coal Co. v. Globe & Rutgers Fire Ins. Co.,* 6 F.2d 736, 738–39 (2d Cir.1925) ("It is certainly important that on such a subject as [the meaning of "collision" in maritime law] the courts of this country should be in agreement, and it is also desirable, if possible, that the courts of England and of the United States in like manner should be in accord."); *Quillan,* 180 F. at 683 ("The conclusion arrived at by the highest courts of the greatest commercial nation in the world [*i.e.,* Great Britain] ought to have weight everywhere.").[40] Today we reaffirm our earlier decisions in recognizing the importance of international uniformity in the laws governing the maritime trade.

## CONCLUSION

For the foregoing reasons, we vacate that part of the district court's judgment granting the Shippers' motions for judgment, and remand for proceedings consistent with this opinion.

---

**40.** There is wide agreement among scholarly commentators that international uniformity of COGSA interpretation is desirable. *See, e.g.,* Sukhninder Panesar, *The Shipment of Dangerous Goods and Strict Liability,* [1998] Int'l Co. & Com. L.Rev. 136, 140 ("If we are to accept that the rule in the United States is that Article IV, r. 6 is qualified by r. 3, then we have two different interpretations of the Hague Rules which is clearly contrary to the principles of uniformity in the interpretation of an international convention."); F.D. Rose, *Liability for Dangerous Goods: The Giannis N.K.,* [1998] Lloyd's Mar. & Com. L.Q. 480, 484 (stating that if there is a "rift" between U.S. and British approaches to COGSA shipper liability, it is a "division which the U.S. courts may nonetheless heal if they accept that in fact their courts have not yet clearly resolved the point and that the House's lead [in *Effort Shipping* ] is correct"); Sturley, *The History of COGSA, supra,* at 57 ("The general acceptance of the Hague Rules is in many ways only the beginning of an unfinished story. Although there was then essentially world-wide uniformity in text, uniformity of interpretation remained (and remains) a problem.").